**James E. SIMMONS, Plaintiff,**

v.

**Colonel Carl R. BAKER, Vernon E. Poe, L.E. McCann, and Julian E. Boyer, Defendants.**

**Civ. A. No. 3:93CV357.**

United States District Court, E.D. Virginia, Richmond Division.

Feb. 3, 1994.

---

884

Sharon Antonina Bradshaw, Gerald Thomas Zerkin, Robert Godfrey, Gerald T. Zerkin

& Associates, and David Preston Baugh, Richmond, VA, for plaintiff.

Stephen D. Rosenthal, Gail Starling Marshall, William H. Hauser, Barbara Jean Gaden, Office of the Atty. Gen., Richmond, VA, for defendants Virginia State Police; Carl R. Baker; L.E. McCann.

Frederick Richard Koazk, Archer Lafayette Yeatts, III, Maloney, Yeatts & Barr, Richmond, VA, for defendant Vernon E. Poe.

Linwood Theodore Wells, Jr., Office of Atty. Gen., Criminal Litigation Section, Richmond, VA, for defendant Julian E. Boyer.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court on the following motions: (1) defendants' motions for summary judgment; (2) plaintiff's cross-motion for partial summary judgment; (3) plaintiff's motion for class certification; (4) plaintiff's motion for defendant class certification; and (5) defendant Boyer's motions to dismiss and to overrule plaintiff's request for class certification. For the reasons stated below, the Court denies the plaintiff's motions, grants in part the defendants' motions for summary judgment and grants defendant Boyer's motion to dismiss.

### I. Facts

On January 25, 1992, at approximately 1:00 a.m., an elderly white woman was robbed and raped in her home in Powhatan County, Virginia. The crime was investigated by members of the Powhatan Sheriff's Office, led by Deputy Sheriff Vernon Poe, a co-defendant in this case. The victim described her assailant as a male of medium or average height (5′8″ to 5′10″) and average weight and build. She said her attacker had a "mild" voice with a "northern" accent. Though she could not be certain of her attacker's race because he wore a mask and gloves, the victim told investigators that she thought her assailant was white because his voice sounded like a white man.

During their initial investigation of the rape, investigators from the Powhatan Sheriff's Office determined that the attacker had entered the home through a window in the kitchen. He had moved a plant from the windowsill before entering and then replaced the plant on the sill and closed the window, spilling dirt and trapping a portion of the plant in the window in the process. Investigators determined that neither the storm nor the interior window were locked, although they appeared to be fully closed. Dogs tracked to the nearby home of Eric Land, a white male. Poe considered both Land and his brother Mark to be possible suspects but dismissed Mark, who was 6′3″ to 6′4″ tall and very thin, because he did not meet the victim's physical description of the assailant. Eric Land remained a suspect in the case.

An initial statewide broadcast of the offense on January 25, 1992 advised that the suspect was believed to be a white male of average height and build and approximately 25 to 35 years old.

On January 27, 1992, a national broadcast advised that the assailant was of average height and build and unknown race. On that same day, Poe called defendant Larry E. McCann, a Special Agent with the Virginia State Police, to consult with him about the case. Poe related the circumstances of the rape to McCann and the evidence uncovered. Poe also gave McCann the victim's description of her attacker and indicated that the victim was unable to identify her attacker's race. McCann never visited the crime scene and did not personally review any of the evidence developed by Powhatan County investigators. Instead, all the information McCann considered was provided second-hand by Poe.

Analyzing the information given to him by Poe, McCann told Poe that the attacker probably had the following characteristics: [1]

---

1. McCann, a 20–year veteran of the State Police, is one of only 33 people in the United States to have graduated from a fellowship program given by the F.B.I. in criminal investigative analysis. McCann stated in his deposition that by using the techniques of investigative analysis "you can build a composite of the major personality and behavioral characteristics of this unknown offender." (McCann Dep. I at 13.) Furthermore, he stated that the "profile" developed is based on the crime, the scene of the crime, the evidence and the type of victim. (McCann Dep. I at 34–

1) young black male (16 to early 20s);

2) lives with older female and possibly sisters;

3) lives close to the victim;

4) selects victims by peeping;

5) possibly in minor trouble with police previously;

6) walks or rides a bike;

7) is meek, quiet, shy, retiring;

8) is out at night;

9) is someone who has had prior contact with the victim, such as a laborer, etc.

10) may rape another victim within two weeks

After conferring with McCann, Poe talked to neighbors and family of the victim, trying to identify "anyone that had contact with her out of the normal personal scope of contact. . . ." (Poe Dep. at 17.) In addition, the sheriff's department issued requests to the public for information concerning the rape, including information about people who may have been seen in the area before the rape. As a result of this inquiry, the sheriff's office received a call from someone who stated that the plaintiff, James E. Simmons, had recently washed windows at the victim's residence. Attempts were made by the sheriff's office to contact Simmons for questioning. On January 30, 1992, Simmons' aunt and his mother came to the sheriff's department to speak to Poe. They told Poe that Simmons and his mother had cleaned the windows and gutters at the victim's residence on two days at the end of October 1991.

In addition, based on information obtained from his inquiries, Poe developed a list of 15 to 20 names of potential suspects to interview. The list was compiled by looking primarily for men who had had some contact with the victim, had medium height and build, had a northern accent and lived in the general area. Of the potential suspects on the list whose race Poe knew, the racial makeup of the group was equally divided between white and black.

Poe investigated people on the list in no particular order. As the investigation progressed, three or four suspects consented to

blood samples, which eliminated them from consideration. One person on the list, John Burruss, committed suicide shortly after the investigation began. Burruss, a white male who lived with his mother near the victim, had a history of drug abuse and erratic behavior. He was a loner with no known girlfriend and was employed in menial jobs. Burruss also fit the general physical description of the assailant. At the request of Burruss' family, a blood sample was taken post mortem, which ruled him out as a suspect.

In the course of his investigation, Poe consulted with McCann several times. On February 6, 1992, Poe asked McCann to contact authorities at the F.B.I. and consult with them about McCann's analysis. Specifically, Poe asked McCann to ask the F.B.I. whether the analysis would be different if the suspect were a white male.

Accordingly, McCann contacted Steve Mardigian at the F.B.I. Academy at Quantico, Virginia. Mardigian told McCann that the F.B.I. did not handle single sexual assault cases unless there was significant behavior demonstrated by the rapist or unless violence was involved. Mardigian went on to state that if the analyst did want to profile the case, the profile would have to be "highly qualified." (McCann Dep. II at 10.) By highly qualified, McCann understood Mardigian to mean that, in the interest of helping the investigators, a profile could be given as an investigative tool, but it should be made clear that the profile was based only on the available information and that more information would be desirable. Specifically, Mardigian would not commit himself to the inclusion of the race identification factor in the profile.

On February 10, 1992, McCann relayed to Poe the substance of his conversation with Mardigian. In addition, McCann again provided Poe with a number of characteristics to aid in the identification of the perpetrator, most of which were the same or substantially the same as the earlier characteristics he had given to Poe but which excluded a race char-

35.) "It's not at all based on who's who in the suspect population." (Id. at 35.)

acteristic.[2] After telling Poe that the F.B.I. would not commit to the race characteristic, McCann never again gave Poe information concerning the possible race of the perpetrator.

Poe interviewed Simmons on February 13, 1992. He later made several unsuccessful attempts to have Simmons come to the office and consent to a blood test.

Poe eventually consulted again with McCann regarding the "short list" of suspects Poe had developed. The list included six white men and five black men (including Simmons). Blood samples were obtained from Simmons and three of the white males, a search warrant was obtained for a blood sample from another white male and two black males on the list were also interviewed and consented to give blood for testing.

Simmons met the general description of the rapist given by the victim: he was 5'10" tall and 160 pounds and he had been born and had lived most of his life in New Jersey and so could be described as having a "northern" accent. Furthermore, Simmons and his mother washed the windows of the victim's home on two consecutive days about ten weeks before the attack. Poe believed that the most salient fact implicating Simmons was the assailant's point of entry. The entry window consisted of an exterior storm window and interior conventional window that slid up and down. The storm window did not lock properly when pushed all the way down. Therefore, although it looked locked, the storm window could be pushed in and the interior window raised to allow entry. Poe surmised that Simmons could have learned of the window's defective condition when he washed windows at the victim's house. Furthermore, the assailant had attempted to conceal his point of entry and had found the victim's upstairs bedroom in the dim light. Thus, Poe surmised that the assailant was someone familiar with the house and had

attempted to hide his point of entry to deflect suspicion from himself.

Poe sought search warrants for both Simmons and Eric Land in order to obtain blood samples for analysis. In drafting the affidavit for Simmons' search warrant, Poe used parts of the profiles given to him by McCann on both January 27 and February 10. Poe incorporated those parts of the profiles that matched Simmons, including the race characteristic included in the first analysis. Thus, Poe used the following characteristics:

1) black male;

2) in minor trouble with police previously (Simmons had been arrested on drug charges in New Jersey and on bad check charges in Virginia);

3) 25 years or older (Simmons was 29);

4) lives with an older female or sister (Simmons had resided with his aunt for several years prior to recently building his own home);

5) employed in a menial job with non-public contact (Simmons had been employed as a laborer and as a companion to critically ill persons);

6) has had some type of casual contact with the victim in the past (Simmons had washed the victim's windows)

In addition to the characteristics that matched Simmons, Poe included in the affidavit elements of the profile that could not be objectively characterized as matching Simmons, but that were not necessarily inconsistent with him, such as:

1) described by friends or people in the community as quiet or shy;

2) gentle and passive;

3) classified as a "Mama's boy;"

4) inadequate personality;

5) classified as a loner

Poe specifically omitted from the affidavit elements of the profile and other information that were inconsistent with Simmons.[3] To

---

2. The characteristics were: lives, works, visits the area where the victim lived; inadequate personality; gentle, passive, quiet; unmarried or, if married, married to a significantly younger or "ugly" wife; non-athletic; resides with older female relative; a loner with few friends; works at

a menial job with little public contact; Mama's boy; difficulty relating to women; age 25 or up.

3. Poe omitted the following characteristics: lives or works close (Simmons lived several miles from the victim); non-athletic; single, or if married, married to a significantly younger or ugly

the extent there were any discrepancies between the lists of characteristics given to him by McCann on January 27 and February 10, Poe resolved the conflicts by choosing the ones he would use in the affidavit. McCann's only involvement in the drafting of the affidavit consisted of responding to Poe's request for his credentials.

Poe obtained the search warrant from codefendant Julian E. Boyer, the Powhatan County Magistrate, on March 12, 1992 and executed it shortly thereafter. The blood sample obtained from Simmons eliminated him from further consideration as a suspect.

Poe also submitted an affidavit for search warrant to obtain a blood sample from Eric Land.[4] The search warrant was issued for Land, but before Poe could execute it, Kenneth Ray Pack, a white man, was apprehended in connection with a similar rape and subsequently pled guilty to the January 25 rape as well.

Simmons brought this suit against various county and state law enforcement officers and a magistrate alleging violation of his rights to due process and equal protection of the laws, as secured to him by the 4th, 13th and 14th Amendments. The action was brought pursuant to 42 U.S.C. §§ 1983 and 1985(3), seeking declaratory and injunctive relief against all defendants, both for himself and for a class of persons he seeks to represent. Simmons also seeks individual monetary damages under both sections against Poe and McCann in their individual capacities.

## II. *Analysis*

### A. SUMMARY JUDGMENT UNDER RULE 56

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are material if they might affect the outcome of the case; there is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### 1. *Simmons' § 1983 Claim*

Simmons has brought suit against Poe and McCann individually for violation of 42 U.S.C. § 1983, which provides redress against individuals acting under color of law who deprive a United States citizen of "any rights, privileges or immunities secured by the Constitution and laws." The defendants were acting under color of law when, in connection with their investigation of the crime and the application for a search warrant, they functioned as law enforcement officials employed by the Commonwealth.

■ The Court finds, however, that an issue of material fact exists with respect to whether Simmons suffered a constitutional deprivation. The defendants contend that Simmons suffered no such deprivation because other facts in the affidavit besides the probability that the perpetrator was a black male supported probable cause. Therefore, the defendants argue, if the race factor or even the entire profile were removed from the affidavit, it would still contain ample facts to support probable cause for the issuance of the search warrant.

Absent the profile, however, the affidavit indicated only that Simmons had washed the victim's windows ten weeks earlier, that the victim stated that her assailant had a northern accent and Simmons came from New Jersey and that Simmons matched two general physical characteristics of the perpetrator given by the victim (*i.e.*, average height and build). In evaluating the validity of a search and seizure the Court must consider "the totality of the circumstances." *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The Court cannot say, as a matter of law, that the facts put forth in

---

wife (Simmons is married but his wife is not significantly younger than he); young black male (16 to early 20s) (Simmons was 29). In addition, Poe omitted the fact that a dog tracked to the home of another individual and that cat hair had been found in the bed of the victim but neither the victim nor Simmons owned a cat.

**4.** Poe did not use McCann's profiles in this affidavit.

the affidavit were enough to support probable cause.

◼ Furthermore, to show a constitutional violation, Simmons must establish that (1) the information in the affidavit was knowingly and intentionally false or made in reckless disregard of the truth and (2) the false information is essential to the probable cause determination. *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978). The Court finds that Simmons has introduced evidence sufficient to raise a genuine issue of material fact as to the first issue. Specifically, Poe's intentional withholding of the victim's belief that a white man committed the crime, his reworking of the profile to ignore the teachings of Mardigian at the F.B.I. Academy and his scissoring and pasting of the profile characteristics obtained from McCann can only be attributed to racial stereotyping. In addition, as previously stated, whether the false information was essential to the probable cause determination raises a genuine issue of material fact.

*Qualified Immunity*

◼ Government officials have qualified immunity for discretionary functions so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). A police officer is entitled to prevail on an assertion of qualified immunity if a reasonable officer possessing the same information would have believed his conduct was lawful. *Shaw v. Stroud*, 13 F.3d 791, 801 (4th Cir. 1994) (citations omitted).

Both Poe and McCann argue that they are entitled to qualified immunity because, if Simmons' constitutional rights were violated, they were not clearly established at the time so that a reasonable person in either of their positions would not have known that his ac-

tions were unconstitutional. The Court rejects these arguments.

◼ Virginia law has clearly forbidden the use of race as a part of a profile, even for the purpose of satisfying the significantly less onerous standard associated with investigatory stops. *See Lowery v. Commonwealth*, 9 Va.App. 314, 388 S.E.2d 265, 267 (1990).[5] The use of race in such fashion violates both the Equal Protection Clause of the Fourteenth Amendment and the reasonableness requirement of the Fourth Amendment. *Id.* Therefore, clearly, an officer cannot use race in a profile as evidence in determining probable cause for a search warrant.[6]

In light of the clearly established standards governing the use of profile evidence, a reasonable officer in Poe's position would believe that his conduct violated clearly established law regarding the use of such profiles. For the same reasons, McCann's contention of entitlement to qualified immunity must be rejected. McCann not only gave Poe the profile to use for investigative purposes, but he gave his permission for the profile, along with his credentials as support, to be used in the affidavit to the magistrate. Thus, neither Poe nor McCann is entitled to qualified immunity.

### 2. Simmons' § 1985(3) Claim

◼ Simmons alleges that the defendants conspired for the purpose of depriving him, either directly or indirectly, of the equal protection of the law by creating and utilizing a race-based profile to fabricate probable cause for the issuance of a search warrant, in violation of 42 U.S.C. § 1985(3). Under § 1985(3), Simmons must prove (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; (3) an overt act in furtherance of the object of the conspiracy; and (4) that plaintiff was injured in his person or property or was deprived of having

---

**5.** Though the court in *Lowery* upheld the stop as being justified by other, objective evidence, it nevertheless plainly held that "the Commonwealth's use of the defendant's race to justify stopping his vehicle" violated his constitutional rights.

**6.** The Court does not hold that race may not be used to describe a person who has committed a crime where some evidence of race exists, such as a racial description from the victim.

and exercising a right or privilege of a United States citizen. *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir.1986) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971)).

 Simmons' has not sustained his burden of proving an agreement to deprive him of his constitutional rights. Independent acts of two or more alleged wrongdoers do not constitute a conspiracy. *See Murdaugh Volkswagen, Inc. v. First Nat'l Bank,* 639 F.2d 1073, 1075 (4th Cir.1981). No evidence exists that Poe conspired with any of the other defendants in drafting the search warrant affidavit or presenting it to the magistrate for a probable cause determination. In addition, no facts exist to demonstrate a meeting of the minds or unity of purpose among the defendants to deprive Simmons of his constitutional rights. The only fact that could possibly suggest such an agreement is McCann's granting of his permission to Poe to use his credentials in the affidavit. Yet McCann had no other participation in the drafting of the affidavit. Furthermore, he had previously told Poe that the F.B.I. would not endorse the race characteristic and had given Poe a profile that excluded the race of the perpetrator. The Court thinks that under these circumstances, while McCann's acts may have helped cause Simmons' injury, Simmons has failed to create an issue of material fact as to the existence of a conspiracy.

### 3. *Baker Cannot be Held Liable for McCann's Actions*

Colonel Carl R. Baker is the superintendent of the Virginia State Police, where McCann is employed. This position constitutes his only involvement in this case.

 Supervisory officials may be held liable in certain circumstances for constitutional injuries inflicted by their subordinates. *Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir.1984), *cert. denied,* 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). Liability in those circumstances is premised.on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in constitutional injuries. *Id.* at 372–73. To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud,* 13 F.3d at 798–99 (4th Cir. 1994) (citations omitted).

 Simmons cannot establish these elements. Though Baker may have been aware that McCann used his training in criminal investigative analysis to assist county law enforcement officials, Baker had no reason to suspect that such conduct might pose an unreasonable risk of constitutional injury. In fact, it is questionable whether McCann's provision of assistance in itself caused such a risk. Therefore, Baker cannot be held to have exhibited tacit authorization or deliberate indifference to constitutional injuries.

### B. CLASS CERTIFICATION

 Simmons seeks certification of a class of plaintiffs. In order to be entitled to class certification, certain prerequisites must be met. *See* Fed.R.Civ.P. 23. Rule 23(a) requires that: (1) the class be so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative party will fairly and adequately protect the interests of the class (representativeness). The class Simmons seeks to represent cannot meet these requirements.

A police officer seeking a search warrant includes in his affidavit information specific to the case on which he is working and not generally applicable to other cases or defendants. Furthermore, all the information included to support probable cause influences a magistrate's decision of whether to grant the

warrant. In this case, Poe included such information as the fact that Simmons had worked for the victim about ten weeks before the attack and that he had lived in New Jersey and so could be considered to have a "northern" accent as indicated by the victim. Thus, because of the many factors that will differ in each defendant's case, Simmons cannot establish numerosity, typicality or commonality.

For similar reasons, Simmons' motion for certification of a defendant class of all Virginia magistrates who currently have, or in the future will have, the power to issue search warrants must also be denied. The incidents of which Simmons complains were based on unique responses to a specific crime and to the facts known about the circumstances of that crime. Therefore, no class exists for Simmons to represent, and the Court denies Simmons' requests for certification of a class of plaintiffs and of defendant magistrates.

## C. NO BASIS FOR INJUNCTIVE RELIEF

To obtain injunctive relief, Simmons must show a "real or immediate threat that [he] will be wronged again—a 'likelihood of substantial and immediate irreparable injury.'" *City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983) (citation omitted). Furthermore, an injunction is unavailable where there is no continuing violation of law. *See Green v. Mansour,* 474 U.S. 64, 67–68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985). Simmons has shown no real or immediate threat that his constitutional rights will be violated by any of the defendants nor has he shown a continuing violation of his constitutional rights. Therefore, the Court grants the defendants' motion for summary judgment with respect to Simmons' claim for injunctive relief.

## D. BOYER'S MOTIONS TO DISMISS AND TO OVERRULE REQUEST FOR CLASS CERTIFICATION

Defendant Boyer has filed a motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted. Based on the Court's other rulings in this case, Simmons can obtain adequate relief from the other parties before the Court. Therefore, the Court dismisses Simmons' complaint with respect to Boyer.

In light of the Court's prior discussion of the class certification issues, the Court need not address Boyer's motion with respect to these issues.

### III. *Conclusion*

For the reasons stated above, the Court denies the plaintiff's motions, grants in part the defendants' motions for summary judgment and grants defendant Boyer's motion to dismiss the complaint with respect to him.

Let the Clerk send a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.