# UNITED STATES *v.* SOKOLOW

No. 87–1295.   Argued January 10, 1989—Decided April 3, 1989

2

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, STEVENS, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 11.

*Paul J. Larkin, Jr.*, argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Acting Assistant Attorney General Dennis, Deputy Solicitor General Bryson,* and *Patty Merkamp Stemler.*

*Robert P. Goldberg* argued the cause and filed a brief for respondent.

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent Andrew Sokolow was stopped by Drug Enforcement Administration (DEA) agents upon his arrival at Honolulu International Airport. The agents found 1,063 grams of cocaine in his carry-on luggage. When respondent was stopped, the agents knew, *inter alia,* that (1) he paid $2,100 for two airplane tickets from a roll of $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage. A divided panel of the United States Court of Appeals for the Ninth Circuit held that the DEA agents did not have a reasonable suspicion to stop respondent, as required by the Fourth Amendment. 831 F. 2d 1413 (1987). We take the contrary view.

This case involves a typical attempt to smuggle drugs through one of the Nation's airports.[1] On a Sunday in July 1984, respondent went to the United Airlines ticket counter at Honolulu Airport, where he purchased two round-trip tickets for a flight to Miami leaving later that day. The tickets were purchased in the names of "Andrew Kray" and "Janet Norian" and had open return dates. Respondent paid $2,100 for the tickets from a large roll of $20 bills, which appeared to contain a total of $4,000. He also gave the ticket agent his home telephone number. The ticket agent noticed that respondent seemed nervous; he was about 25 years old; he was dressed in a black jumpsuit and wore gold jewelry; and he was accompanied by a woman, who turned out to be Janet Norian. Neither respondent nor his companion checked any of their four pieces of luggage.

After the couple left for their flight, the ticket agent informed Officer John McCarthy of the Honolulu Police Department of respondent's cash purchase of tickets to Miami. Officer McCarthy determined that the telephone number respondent gave to the ticket agent was subscribed to a "Karl Herman," who resided at 348–A Royal Hawaiian Avenue in Honolulu. Unbeknownst to McCarthy (and later to the DEA agents), respondent was Herman's roommate. The ticket agent identified respondent's voice on the answering machine at Herman's number. Officer McCarthy was unable to find any listing under the name "Andrew Kray" in Hawaii. McCarthy subsequently learned that return reservations from Miami to Honolulu had been made in the names of Kray and Norian, with their arrival scheduled for July 25, three days after respondent and his companion had left. He also learned that Kray and Norian were scheduled to make stopovers in Denver and Los Angeles.

---

[1] The facts in this case were developed at suppression hearings held in the District Court over three separate days. The parties also stipulated to certain facts.

On July 25, during the stopover in Los Angeles, DEA agents identified respondent. He "appeared to be very nervous and was looking all around the waiting area." App. 43–44. Later that day, at 6:30 p.m., respondent and Norian arrived in Honolulu. As before, they had not checked their luggage. Respondent was still wearing a black jumpsuit and gold jewelry. The couple proceeded directly to the street and tried to hail a cab, where Agent Richard Kempshall and three other DEA agents approached them. Kempshall displayed his credentials, grabbed respondent by the arm, and moved him back onto the sidewalk. Kempshall asked respondent for his airline ticket and identification; respondent said that he had neither. He told the agents that his name was "Sokolow," but that he was traveling under his mother's maiden name, "Kray."

Respondent and Norian were escorted to the DEA office at the airport. There, the couple's luggage was examined by "Donker," a narcotics detector dog, which alerted on respondent's brown shoulder bag. The agents arrested respondent. He was advised of his constitutional rights and declined to make any statements. The agents obtained a warrant to search the shoulder bag. They found no illicit drugs, but the bag did contain several suspicious documents indicating respondent's involvement in drug trafficking. The agents had Donker reexamine the remaining luggage, and this time the dog alerted on a medium-sized Louis Vuitton bag. By now, it was 9:30 p.m., too late for the agents to obtain a second warrant. They allowed respondent to leave for the night, but kept his luggage. The next morning, after a second dog confirmed Donker's alert, the agents obtained a warrant and found 1,063 grams of cocaine inside the bag.

Respondent was indicted for possession with the intent to distribute cocaine in violation of 21 U. S. C. § 841(a)(1). The United States District Court for Hawaii denied his motion to suppress the cocaine and other evidence seized from his luggage, finding that the DEA agents had a reasonable suspicion

that he was involved in drug trafficking when they stopped him at the airport. Respondent then entered a conditional plea of guilty to the offense charged.

The United States Court of Appeals for the Ninth Circuit reversed respondent's conviction by a divided vote, holding that the DEA agents did not have a reasonable suspicion to justify the stop. 831 F. 2d, at 1423.[2] The majority divided the facts bearing on reasonable suspicion into two categories. In the first category, the majority placed facts describing "ongoing criminal activity," such as the use of an alias or evasive movement through an airport; the majority believed that at least one such factor was always needed to support a finding of reasonable suspicion. *Id.*, at 1419. In the second category, it placed facts describing "personal characteristics" of drug couriers, such as the cash payment for tickets, a short trip to a major source city for drugs, nervousness, type of attire, and unchecked luggage. *Id.*, at 1420. The majority believed that such characteristics, "shared by drug couriers and the public at large," were only relevant if there was evidence of ongoing criminal behavior and the Government offered "[e]mpirical documentation" that the combination of facts at issue did not describe the behavior of "significant numbers of innocent persons." *Ibid.* Applying this two-part test to the facts of this case, the majority found that there was no evidence of ongoing criminal behavior, and thus that the agents' stop was impermissible. The dissenting judge took the view that the majority's approach was "overly mechanistic" and "contrary to the case-by-case determination of reasonable articulable suspicion based on *all* the facts." *Id.*, at 1426.

---

[2] In an earlier decision, the Court of Appeals also reversed the District Court, but on the basis of different reasoning. 808 F. 2d 1366, vacated, 831 F. 2d 1413 (1987). The Court of Appeals' second decision was issued after the Government petitioned for rehearing on the ground that the court had erred in considering each of the facts known to the agents separately rather than in terms of the totality of the circumstances.

We granted certiorari to review the decision of the Court of Appeals, 486 U. S. 1042 (1988), because of its serious implications for the enforcement of the federal narcotics laws. We now reverse.

The Court of Appeals held that the DEA agents seized respondent when they grabbed him by the arm and moved him back onto the sidewalk. 831 F. 2d, at 1416. The Government does not challenge that conclusion, and we assume—without deciding—that a stop occurred here. Our decision, then, turns on whether the agents had a reasonable suspicion that respondent was engaged in wrongdoing when they encountered him on the sidewalk. In *Terry* v. *Ohio*, 392 U. S. 1, 30 (1968), we held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause.

The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id.*, at 27. The Fourth Amendment requires "some minimal level of objective justification" for making the stop. *INS* v. *Delgado*, 466 U. S. 210, 217 (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," *Illinois* v. *Gates*, 462 U. S. 213, 238 (1983), and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause, see *United States* v. *Montoya de Hernandez*, 473 U. S. 531, 541, 544 (1985).

The concept of reasonable suspicion, like probable cause, is not "readily, or even usefully, reduced to a neat set of legal rules." *Gates*, *supra*, at 232. We think the Court of Appeals' effort to refine and elaborate the requirements of "reasonable suspicion" in this case creates unnecessary difficulty in dealing with one of the relatively simple concepts embod-

8

ied in the Fourth Amendment. In evaluating the validity of a stop such as this, we must consider "the totality of the circumstances—the whole picture." *United States* v. *Cortez,* 449 U. S. 411, 417 (1981). As we said in *Cortez:*

> "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers." *Id.,* at 418.

The rule enunciated by the Court of Appeals, in which evidence available to an officer is divided into evidence of "ongoing criminal behavior," on the one hand, and "probabilistic" evidence, on the other, is not in keeping with the quoted statements from our decisions. It also seems to us to draw a sharp line between types of evidence, the probative value of which varies only in degree. ` The Court of Appeals classified evidence of traveling under an alias, or evidence that the suspect took an evasive or erratic path through an airport, as meeting the test for showing "ongoing criminal activity." But certainly instances are conceivable in which traveling under an alias would not reflect ongoing criminal activity: for example, a person who wished to travel to a hospital or clinic for an operation and wished to conceal that fact. One taking an evasive path through an airport might be seeking to avoid a confrontation with an angry acquaintance or with a creditor. This is not to say that each of these types of evidence is not highly probative, but they do not have the sort of ironclad significance attributed to them by the Court of Appeals.

On the other hand, the factors in this case that the Court of Appeals treated as merely "probabilistic" also have probative significance. Paying $2,100 in cash for two airplane tickets is out of the ordinary, and it is even more out of the ordinary to pay that sum from a roll of $20 bills containing nearly twice that amount of cash. Most business travelers, we feel confident, purchase airline tickets by credit card or check so as to

have a record for tax or business purposes, and few vacationers carry with them thousands of dollars in $20 bills. We also think the agents had a reasonable ground to believe that respondent was traveling under an alias; the evidence was by no means conclusive, but it was sufficient to warrant consideration.[3] While a trip from Honolulu to Miami, standing alone, is not a cause for any sort of suspicion, here there was more: surely few residents of Honolulu travel from that city for 20 hours to spend 48 hours in Miami during the month of July.

Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion. See *Florida* v. *Royer*, 460 U. S. 491, 502 (1983) (opinion of WHITE, J.); *id.*, at 515–516 (BLACKMUN, J., dissenting); *id.*, at 523–524 (REHNQUIST, J., dissenting).[4] We said in *Reid* v. *Georgia*, 448 U. S. 438 (1980) *(per curiam)*, "there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." *Id.*, at 441.[5] Indeed, *Terry* itself involved "a series of acts,

---

[3] Respondent also claims that the agents should have conducted a further inquiry to resolve the inconsistency between the name he gave the airline and the name, "Karl Herman," under which his telephone number was listed. Brief for Respondent 26. This argument avails respondent nothing; had the agents done further checking, they would have discovered not only that respondent was Herman's roommate but also that his name was "Sokolow" and not "Kray," the name listed on his ticket.

[4] In *Royer*, the police were aware, *inter alia*, that (1) Royer was traveling under an assumed name; (2) he paid for his ticket in cash with a number of small bills; (3) he was traveling from Miami to New York; (4) he put only his name and not an address on his checked luggage; and (5) he seemed nervous while walking through Miami airport. 460 U. S., at 493, n. 2, 502 (opinion of WHITE, J.).

[5] In *Reid*, the Court held that a DEA agent stopped the defendant without reasonable suspicion. At the time of the stop, the agent knew that (1) the defendant flew into Atlanta from Fort Lauderdale, a source city for cocaine; (2) he arrived early in the morning, when police activity was believed to be at a low ebb; (3) he did not check his luggage; and (4) the defendant

each of them perhaps innocent" if viewed separately, "but which taken together warranted further investigation." 392 U. S., at 22; see also *Cortez, supra,* at 417–419. We noted in *Gates,* 462 U. S., at 243–244, n. 13, that "innocent behavior will frequently provide the basis for a showing of probable cause," and that "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." That principle applies equally well to the reasonable suspicion inquiry.

We do not agree with respondent that our analysis is somehow changed by the agents' belief that his behavior was consistent with one of the DEA's "drug courier profiles."[6] Brief for Respondent 14–21. A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a "profile" does not somehow detract from their evidentiary significance as seen by a trained agent.

Respondent also contends that the agents were obligated to use the least intrusive means available to verify or dispel their suspicions that he was smuggling narcotics. *Id.,* at 12–13, 21–23. In respondent's view, the agents should have simply approached and spoken with him, rather than forcibly detaining him. He points to the statement in *Florida* v. *Royer, supra,* at 500 (opinion of WHITE, J.), that "the in-

---

and his companion appeared to be attempting to hide the fact that they were together. The Court held that the first three of these facts were not sufficient to supply reasonable suspicion, because they "describe a very large category of presumably innocent travelers," while the last fact was insufficient on the facts of that case to establish reasonable suspicion. 448 U. S., at 441.

[6] Agent Kempshall testified that respondent's behavior "had all the classic aspects of a drug courier." App. 59. Since 1974, the DEA has trained narcotics officers to identify drug smugglers on the basis of the sort of circumstantial evidence at issue here.

vestigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." That statement, however, was directed at the length of the investigative stop, not at whether the police had a less intrusive means to verify their suspicions before stopping Royer. The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions—here, respondent was about to get into a taxicab—and it would require courts to "indulge in 'unrealistic second-guessing.'" *Montoya de Hernandez*, 473 U. S., at 542, quoting *United States* v. *Sharpe*, 470 U. S. 675, 686, 687 (1985).

We hold that the agents had a reasonable basis to suspect that respondent was transporting illegal drugs on these facts. The judgment of the Court of Appeals is therefore reversed, and the case is remanded for further proceedings consistent with our decision.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Because the strongest advocates of Fourth Amendment rights are frequently criminals, it is easy to forget that our interpretations of such rights apply to the innocent and the guilty alike. *Illinois* v. *Gates*, 462 U. S. 213, 290 (1983) (BRENNAN, J., dissenting). In the present case, the chain of events set in motion when respondent Andrew Sokolow was stopped by Drug Enforcement Administration (DEA) agents at Honolulu International Airport led to the discovery of cocaine and, ultimately, to Sokolow's conviction for drug trafficking. But in sustaining this conviction on the ground that the agents reasonably suspected Sokolow of ongoing criminal activity, the Court diminishes the rights of *all* citizens "to be secure in their persons," U. S. Const., Amdt. 4, as they

traverse the Nation's airports. Finding this result constitutionally impermissible, I dissent.

The Fourth Amendment cabins government's authority to intrude on personal privacy and security by requiring that searches and seizures usually be supported by a showing of probable cause. The reasonable-suspicion standard is a derivation of the probable-cause command, applicable only to those brief detentions which fall short of being full-scale searches and seizures and which are necessitated by law enforcement exigencies such as the need to stop ongoing crimes, to prevent imminent crimes, and to protect law enforcement officers in highly charged situations. *Terry* v. *Ohio*, 392 U. S. 1, 30 (1968). By requiring reasonable suspicion as a prerequisite to such seizures, the Fourth Amendment protects innocent persons from being subjected to "overbearing or harassing" police conduct carried out solely on the basis of imprecise stereotypes of what criminals look like, or on the basis of irrelevant personal characteristics such as race. *Id.*, at 14–15, and n. 11 (citation omitted).

To deter such egregious police behavior, we have held that a suspicion is not reasonable unless officers have based it on "specific and articulable facts." *Id.*, at 21; see also *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 880 (1975). It is not enough to suspect that an individual has committed crimes in the past, harbors unconsummated criminal designs, or has the propensity to commit crimes. On the contrary, before detaining an individual, law enforcement officers must reasonably suspect that he is engaged in, or poised to commit, a criminal act *at that moment*. See, *e. g.*, *Brown* v. *Texas*, 443 U. S. 47, 51 (1979) (to detain, officers must "have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity"); *Terry, supra*, at 30 (reasonable suspicion exists only where policeman reasonably concludes, *inter alia*, "that criminal activity may be afoot"). The rationale for permitting brief, warrantless seizures is, after all, that it is impractical to demand strict compliance

with the Fourth Amendment's ordinary probable-cause requirement in the face of ongoing or imminent criminal activity demanding "swift action predicated upon the on-the-spot observations of the officer on the beat." *Terry, supra,* at 20. Observations raising suspicions of past criminality demand no such immediate action, but instead should appropriately trigger routine police investigation, which may ultimately generate sufficient information to blossom into probable cause.

Evaluated against this standard, the facts about Andrew Sokolow known to the DEA agents at the time they stopped him fall short of reasonably indicating that he was engaged at the time in criminal activity. It is highly significant that the DEA agents stopped Sokolow because he matched one of the DEA's "profiles" of a paradigmatic drug courier. In my view, a law enforcement officer's mechanistic application of a formula of personal and behavioral traits in deciding whom to detain can only dull the officer's ability and determination to make sensitive and fact-specific inferences "in light of his experience," *Terry, supra,* at 27, particularly in ambiguous or borderline cases. Reflexive reliance on a profile of drug courier characteristics runs a far greater risk than does ordinary, case-by-case police work of subjecting innocent individuals to unwarranted police harassment and detention. This risk is enhanced by the profile's "chameleon-like way of adapting to any particular set of observations." 831 F. 2d 1413, 1418 (CA9 1987). Compare, *e. g., United States* v. *Moore,* 675 F. 2d 802, 803 (CA6 1982) (suspect was first to deplane), cert. denied, 460 U. S. 1068 (1983), with *United States* v. *Mendenhall,* 446 U. S. 544, 564 (1980) (last to deplane), with *United States* v. *Buenaventura-Ariza,* 615 F. 2d 29, 31 (CA2 1980) (deplaned from middle); *United States* v. *Sullivan,* 625 F. 2d 9, 12 (CA4 1980) (one-way tickets), with *United States* v. *Craemer,* 555 F. 2d 594, 595 (CA6 1977) (round-trip tickets), with *United States* v. *McCaleb,* 552 F. 2d 717, 720 (CA6 1977) (nonstop flight), with *United States* v. *Sokolow,* 808 F. 2d 1366, 1370 (CA9), vacated, 831 F. 2d 1413

(1987) (case below) (changed planes); *Craemer, supra,* at 595 (no luggage), with *United States* v. *Sanford,* 658 F. 2d 342, 343 (CA5 1981) (gym bag), cert. denied, 455 U. S. 991 (1982), with *Sullivan, supra,* at 12 (new suitcases); *United States* v. *Smith,* 574 F. 2d 882, 883 (CA6 1978) (traveling alone), with *United States* v. *Fry,* 622 F. 2d 1218, 1219 (CA5 1980) (traveling with companion); *United States* v. *Andrews,* 600 F. 2d 563, 566 (CA6 1979) (acted nervously), cert. denied *sub nom. Brooks* v. *United States,* 444 U. S. 878 (1979), with *United States* v. *Himmelwright,* 551 F. 2d 991, 992 (CA5) (acted too calmly), cert. denied, 434 U. S. 902 (1977). In asserting that it is not "somehow" relevant that the agents who stopped Sokolow did so in reliance on a prefabricated profile of criminal characteristics, *ante,* at 10, the majority thus ducks serious issues relating to a questionable law enforcement practice, to address the validity of which we granted certiorari in this case.[1]

That the factors comprising the drug courier profile relied on in this case are especially dubious indices of ongoing criminal activity is underscored by *Reid* v. *Georgia,* 448 U. S. 438 (1980), a strikingly similar case. There, four facts, encoded in a drug courier profile, were alleged in support of the DEA's detention of a suspect at the Atlanta Airport. First, Reid had arrived from Fort Lauderdale, Florida, a source city for cocaine. Second, he arrived in the early morning, when law enforcement activity is diminished. Third, he and his companion appeared to have no luggage other than their shoulder bags. And fourth, he and his companion appeared to be trying to conceal the fact that they were traveling together. *Id.,* at 440–441.

This collection of facts, we held, was inadequate to support a finding of reasonable suspicion. All but the last of these facts, we observed, "describe a very large category of pre-

---

[1] Even if such profiles had reliable predictive value, their utility would be short lived, for drug couriers will adapt their behavior to sidestep detection from profile-focused officers.

sumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Id.*, at 441. The sole fact that suggested criminal activity was that Reid "preceded another person and occasionally looked backward at him as they proceeded through the concourse." *Ibid.* This observation did not of itself provide a reasonable basis for suspecting wrongdoing, for inferring criminal activity from such evidence reflected no more than an "'inchoate and unparticularized suspicion or "hunch."'" *Ibid.*, quoting *Terry*, 392 U. S., at 27.[2]

The facts known to the DEA agents at the time they detained the traveler in this case are scarcely more suggestive of ongoing criminal activity than those in *Reid*. Unlike traveler Reid, who sought to conceal the fact that he was traveling with a companion, and who even attempted to run away after being approached by a DEA agent, 448 U. S., at 439, traveler Sokolow gave no indications of evasive activity. On the contrary, the sole behavioral detail about Sokolow noted by the DEA agents was that he was nervous. With news accounts proliferating of plane crashes, near collisions, and air terrorism, there are manifold and good reasons for being agitated while awaiting a flight, reasons that have nothing to do with one's involvement in a criminal endeavor.

The remaining circumstantial facts known about Sokolow, considered either singly or together, are scarcely indicative of criminal activity. Like the information disavowed in *Reid* as nonprobative, the fact that Sokolow took a brief trip to a

---

[2] Nor was *Reid* a close case: eight Members of the Court found the challenged detention insupportable, five of whom saw fit to dispose of the case by reversing the court below in a *per curiam* opinion. In a separate concurrence, Justice Powell, joined by Chief Justice Burger and JUSTICE BLACKMUN, agreed that "the fragmentary facts apparently relied on by the DEA agents" provided "no justification" for Reid's detention. 448 U. S., at 442, n. 1. Only then-JUSTICE REHNQUIST, the author of today's majority opinion, dissented, on the ground that the police conduct involved did not implicate Reid's constitutional rights. *Id.*, at 442.

resort city for which he brought only carry-on luggage also "describe[s] a very large category of presumably innocent travelers." *Id.*, at 441. That Sokolow embarked from Miami, "a source city for illicit drugs," *ante*, at 3, is no more suggestive of illegality; thousands of innocent persons travel from "source cities" every day and, judging from the DEA's testimony in past cases, nearly every major city in the country may be characterized as a source or distribution city. See, *e. g.*, *Buenaventura-Ariza*, 615 F. 2d, at 31, n. 5. That Sokolow had his phone listed in another person's name also does not support the majority's assertion that the DEA agents reasonably believed Sokolow was using an alias; it is commonplace to have one's phone registered in the name of a roommate, which, it later turned out, was precisely what Sokolow had done.[3] That Sokolow was dressed in a black jumpsuit and wore gold jewelry also provides no grounds for suspecting wrongdoing, the majority's repeated and unexplained allusions to Sokolow's style of dress notwithstanding. *Ante*, at 4, 5. For law enforcement officers to base a search, even in part, on a "pop" guess that persons dressed in a particular fashion are likely to commit crimes not only stretches the concept of reasonable suspicion beyond recognition, but also is inimical to the self-expression which the choice of wardrobe may provide.

Finally, that Sokolow paid for his tickets in cash indicates no imminent or ongoing criminal activity. The majority "feel[s] confident" that "[m]ost business travelers . . . purchase airline tickets by credit card or check." *Ante*, at 8. Why the majority confines its focus only to "business travelers" I do not know, but I would not so lightly infer ongoing crime from the use of legal tender. Making major cash purchases, while surely less common today, may simply reflect the traveler's aversion to, or inability to obtain, plastic

---

[3] That Sokolow was, in fact, using an alias was not known to the DEA agents until *after* they detained him. Thus, it cannot legitimately be considered as a basis for the seizure in this case.

money. Conceivably, a person who spends large amounts of cash may be trying to launder his proceeds from *past* criminal enterprises by converting them into goods and services. But, as I have noted, investigating completed episodes of crime goes beyond the appropriately limited purview of the brief, *Terry*-style seizure. Moreover, it is unreasonable to suggest that, had Sokolow left the airport, he would have been gone forever and thus immune from subsequent investigation. *Ante*, at 11. Sokolow, after all, had given the airline his phone number, and the DEA, having ascertained that it was indeed Sokolow's voice on the answering machine at that number, could have learned from that information where Sokolow resided.

The fact is that, unlike the taking of patently evasive action, *Florida* v. *Rodriguez*, 469 U. S. 1, 6 (1984), the use of an alias, *Florida* v. *Royer*, 460 U. S. 491, 502 (1983), the casing of a store, *Terry*, *supra*, at 6, or the provision of a reliable report from an informant that wrongdoing is imminent, *Illinois* v. *Gates*, 462 U. S., at 225–227, nothing about the characteristics shown by airport traveler Sokolow reasonably suggests that criminal activity is afoot. The majority's hasty conclusion to the contrary serves only to indicate its willingness, when drug crimes or antidrug policies are at issue, to give short shrift to constitutional rights. See, *e. g.*, *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 636 (1989) (MARSHALL, J., dissenting).[4] In requiring that seizures be based on at least some evidence of criminal conduct, 831 F. 2d, at 1419, the Court of Appeals was faithful to the Fourth Amendment principle that law enforcement offi-

---

[4] The majority also contends that it is not relevant that the DEA agents, in forcibly stopping Sokolow rather than simply speaking with him, did not "use the least intrusive means available." *Ante*, at 10. On the contrary, the manner in which a search is carried out —and particularly whether law enforcement officers have taken needlessly intrusive steps —is a highly important index of reasonableness under Fourth Amendment doctrine. See, *e. g.*, *Winston* v. *Lee*, 470 U. S. 753, 760–761 (1985).

cers must reasonably suspect a person of criminal activity before they can detain him. Because today's decision, though limited to its facts, *ante*, at 11, disobeys this important constitutional command, I dissent.