57 F.3d 1071
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellant,
v.
Larry NAILOR, Colangelo Swearengen, Defendants-Appellees.
 No. 94-5451.
 United States Court of Appeals, Sixth Circuit.
 May 31, 1995.
 
 Before GUY, BOGGS and SILER, Circuit Judges.
 PER CURIAM.
 
 
 1
 The United States appeals the district court's decision granting motions to suppress narcotics found during a search of a car in which defendants, Larry Nailor and Colangelo Swearengen, were riding. We reverse, finding that the initial stop of the vehicle was supported by a reasonable, articulable suspicion of criminal activity.
 
 I.
 
 2
 The facts of this case are derived from the testimony at the hearing on the motion to suppress. Officer Worthy of the Memphis Police Department was the sole witness.
 
 
 3
 Officer Worthy's initial involvement with this case occurred when he responded to a call at a fire station, where a woman had reported an attempted robbery. When Worthy interviewed the woman, she told him she had been out walking her dogs when she walked past two black males, approximately 20 to 25 years old. She was then approached from behind by the same men, who said something to the effect, "we're here again, and we're back"; one man pulled a gun, and they attempted to rob her. The woman screamed and ran to the fire station.
 
 
 4
 Although Officer Worthy did not find any eyewitnesses to the crime, he interviewed a man who stated that, when he heard the screaming, he looked out his window and saw two "medium height, medium build, young male blacks" with "low" haircuts, running down the street away from the direction of the woman.[1] One man appeared to be chasing the other until they both got into a car. The witness observed the men from the building next to where the car was parked. The men then drove away in a light-colored, squared-off 1980's model Chevrolet Caprice or, "to the most extreme," a Pontiac 6000. The witness had seen the car parked at the building earlier. Although Officer Worthy twice asked the witness for his name, the witness did not give it.
 
 
 5
 In the course of responding to this call, Worthy observed police officers making a stop involving two black males in a Chevrolet Caprice. He drove the victim back to this location but she said they were not her assailants. The officer then took the woman home.
 
 
 6
 Returning to the fire station, the officer parked in the fire station lot and proceeded to complete his written report of this incident. He was seated in his car, which was visible from the street, with his interior light on, when he noticed two black males drive by extremely slowly. They were looking around and traveling at a rate of between 5 and 10 miles per hour in a 35-mile per hour zone. There was very little traffic in the area. The car was a light-colored, 1980 four-door Chevrolet Caprice headed northbound on Main Street. The officer thought they might have been the men who attempted to rob the woman in front of the fire station an hour earlier. He thought, based upon his past police experience, they were returning to try and rob again, thinking the police had left. He pursued them with his patrol car's blue light on, sounding the siren a "couple of times." After about five blocks, the defendants turned off Main Street onto Linden Street and stopped. Meanwhile the officer radioed for backup and relayed the vehicle's license plate number.
 
 
 7
 The officer instructed the driver, Swearengen, to get out of the car. The officer patted him down and locked him in the back of his patrol car. During this time, the officer observed the passenger's right shoulder dip down and come back up, "like he was putting something down." The passenger, Nailor, was asked to get out of the car, which he did. Nailor was holding money in one hand and had a phone in his pocket. Shortly thereafter, Officer Downs arrived to assist Officer Worthy. Worthy then locked Nailor in Downs's patrol car.
 
 
 8
 Once the defendants were secured, Officer Worthy returned to the defendants' car and shined his flashlight into the front passenger seat. He noticed a bag, containing what appeared to be marijuana, partially hidden under a floor mat. He removed the bag and, since it contained marijuana, he arrested the defendants. Officer Downs then searched the defendants' car and found cocaine in the glove compartment.
 
 
 9
 In a one-count indictment, the defendants were charged with aiding and abetting one another in the possession of approximately 50 grams of cocaine base with intent to distribute, in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2.
 
 
 10
 Defendants filed motions to suppress, alleging Officer Worthy had lacked reasonable suspicion to stop their car. A magistrate judge heard the motions and filed a report recommending they be granted. The district court adopted the magistrate judge's recommendation, and made the following findings of fact, in pertinent part:
 
 
 11
 On September 23, 1993, sometime between 7:00 p.m. and 10:00 p.m. Officer Worthy ... received a call to go to a fire station ... where a woman was reportedly screaming. There, Officer Worthy found a woman who was hysterical but said that while she had been out walking her dogs, she was approached by two black males, approximately 20 to 25 years old, who pulled a gun and attempted to rob her. The woman, however, had screamed and ran toward the fire station.
 
 
 12
 At the fire station, Officer Worthy interviewed an unidentified and now unlocatable male who stated that he had seen from his window two average or "medium size" black males running down the street and that one appeared to be chasing the other until they both got into the same automobile and drove away. He described the automobile as a light colored, squared-off back car, "possibly" a 1980's model Chevrolet Caprice or Pontiac 6000. It is unclear if this unidentified witness had seen these men as a result of the woman's scream.[2] In fact, he had seen the parked car even earlier.
 
 
 13
 Officer Worthy drove the victim to Crump and Wellington where he had earlier observed police officers making a stop involving two black males in a Chevrolet Caprice. The victim did not identify these two men as the men who attempted to rob her; Officer Worthy drove her back to the fire station, spoke with some of the firemen, and then took her home. Officer Worthy returned to the fire station and began making out his report on the incident while seated in his car with the dome light on.
 
 
 14
 During this time, Officer Worthy noticed the defendants drive by in a light colored 1980 four-door Chevrolet Caprice Classic and, thinking that they might "possibly" be the men who attempted to rob the woman in front of the fire station an hour earlier, pursued them with his blue light on, sounding the siren a "couple of times." After about five blocks, the defendants turned right onto Linden and stopped. Officer Worthy testified the defendants did not attempt to evade him and that "it wasn't a pursuit or anything.... They just kept rolling."
 
 
 15
 Based on these findings, the court concluded that the officer lacked reasonable, articulable suspicion to stop the defendants, and granted the motions to suppress. The government now appeals.
 
 II.
 
 16
 The government claims that 1) the district court erred in granting defendants' motions to suppress, and 2) the arresting officer had reasonable suspicion to stop the defendants. A district court's factual findings are upheld unless they are clearly erroneous. United States v. Williams, 962 F.2d 1218, 1221 (6th Cir.), cert. denied, 113 S.Ct. 264 (1992). Whether reasonable suspicion exists is a question of law which we review de novo. Ibid.
 
 
 17
 The Supreme Court has held that when an officer has a reasonable, articulable suspicion that an individual is engaged in criminal activity, the officer may stop and briefly detain such a person for investigative purposes. Terry v. Ohio, 392 U.S. 1, 30 (1968). Probable cause is not required for such a stop, and the level of suspicion required is "considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7 (1989).
 
 
 18
 In evaluating the legality of an investigative stop, we look to the totality of the circumstances. Sokolow, 490 U.S. at 7. An investigative stop is valid if all the relevant factors, taken as a whole, amount to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately. Id. at 9. These relevant factors "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." United States v. Cortez, 449 U.S. 411, 418 (1981).
 
 
 19
 The district court's findings of fact omitted pertinent, uncontroverted evidence which supports the investigative stop. For example, Officer Worthy apprehended the defendants in part because they were at the scene of an attempted robbery shortly after it had occurred. He testified that in his experience would-be assailants have been known to return to a crime scene either to complete a crime or to commit another crime.
 
 
 20
 Also, the court's findings do not reflect the relatively detailed description of the assailants given by the witness, including their style of hair. The witness was in the building next to where the car was parked as he watched them flee. Although, as the district court noted, the witness was "unidentified and now unlocatable," this does not mean the officer could not reasonably use the information he provided.
 
 
 21
 Perhaps the most significant omissions in the findings of fact were the officer's observations that the defendants were driving extremely slowly, between 5 and 10 miles per hour in a 35-mile per hour zone, even though there was very little traffic in that area at that hour of night, and they were looking around. It would be reasonable for such behavior to increase an officer's suspicion. Defendants argue it is not unusual for motorists to slow down upon seeing a police car. Although upon seeing a police car a driver may decrease speed to be sure he is within the speed limit, given the defendants were going 5 to 10 miles per hour, that is not a reasonable inference here.
 
 
 22
 Finally, we think the finding that "Officer Worthy testified the defendants did not attempt to evade him and that " 'it wasn't a pursuit or anything.... They just kept rolling[ ]' " is incomplete. The officer also stated: "But, I mean, usually when the police put their lights on, you are supposed to yield and pull to the right. They did neither." The officer's testimony in full reveals he observed at best ambiguous behavior on defendants' part. Again, reasonable suspicion need not rise to the level of probable cause, and, in these circumstances, we find such behavior probative of suspected wrongdoing.
 
 
 23
 After reviewing the entire record, we cannot agree with the conclusion that reasonable suspicion did not exist under the "totality" of circumstances. As the district court itself observed, the officer "stopped defendants because in his opinion, they matched the description of the assailants in that they were two black males in a light-colored 1980's Chevrolet travelling very slowly in the vicinity of a recent crime." Given that these details matched the description of the assailants and their car, which was given by an eyewitness, we think the officer had reasonable suspicion to stop defendants for further investigation.
 
 
 24
 Nailor claims that the car description was "inconclusive," and Officer Worthy's earlier unsuccessful attempts to identify the assailants in connection with the other stopped Chevrolet Caprice supports a finding of no reasonable suspicion to stop defendants. We disagree. The witness described the automobile's make, model and approximate year. This description gave Officer Worthy a specific focus for his search.
 
 
 25
 The district court concluded that "nothing more than coincidence supported the assumption that the two robbers were the same people who had run to the car"; however, we concur with the government that "it defies common sense to suggest that a reasonable person could not infer that the two men may have been the assailants." An officer is permitted to make common sense deductions based on the facts. See Cortez, 449 U.S. at 418-19.
 
 
 26
 We agree with the district judge that "where the issue is close, it is best to make certain that our liberties are not infringed in the zeal to prosecute." Here, however, we conclude that the totality of the circumstances provided reasonable suspicion sufficient to justify the initial stop.
 
 
 27
 REVERSED and REMANDED.
 
 
 
 [1]
 At one point Officer Worthy testified that the witness looked out his window when he heard the lady scream. Later he testified that he was not sure if the witness heard the woman screaming or not when he had locked out of his window. The witness did not tell Officer Worthy that the two men he saw were the assailants
 
 
 [2]
 There is some confusion in the record as to when the man looked out his window. Officer Worthy later testified that he was not sure if the witness heard the woman screaming or not when he looked out the window. The record makes clear that this witness did not observe the attempted robbery