In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00145-CR
______________________________


CHRISTOPHER K. HERMAN, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the County Court at Law
Harrison County, Texas
Trial Court No. 2004-0205


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Justice Ross


MEMORANDUM OPINION

          Christopher K. Herman was found guilty by a jury of the misdemeanor offense of
driving while intoxicated. See Tex. Pen. Code Ann. § 49.04(a) (Vernon 2003). The trial
court assessed punishment at 180 days' confinement and a $2,000.00 fine. Imposition of
the confinement and payment of $1,200.00 of the fine were suspended, and Herman was
placed on community supervision for sixteen months. Herman appeals, contending the
evidence is factually insufficient to support a necessary element of that offense, the
element of intoxication. We overrule Herman's sole point of error and affirm the trial court's
judgment.
Standard of Review
          We review Herman's challenge to the factual sufficiency of the evidence using the
appropriate appellate standards set forth by the Texas Court of Criminal Appeals. See
Threadgill v. State, 146 S.W.3d 654, 664 (Tex. Crim. App. 2004) (citing Zuniga v. State,
144 S.W.3d 477 (Tex. Crim. App. 2004)). If the evidence is factually insufficient, we must
reverse the conviction and remand the case for a new trial. Clewis v. State, 922 S.W.2d
126, 135 (Tex. Crim. App. 1996).
Evidence Supporting a Finding of "Intoxication"
          In this case, the State had to prove Herman was intoxicated at the time of the traffic
stop. See Tex. Pen. Code Ann. § 49.04(a). Our law defines the term "intoxicated" as "not
having the normal use of mental or physical faculties by reason of the introduction of
alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more
of those substances, or any other substance into the body" or, alternatively, "by having an
alcohol concentration of 0.08 or more." Tex. Pen. Code Ann. § 49.01(2) (Vernon 2003). 
The evidence supporting the State's case consisted of two videotapes and testimony from
Trooper Robert Bryan of the Texas Department of Public Safety's highway patrol division. 
Bryan, a ten-year veteran of the department, testified he initiated a traffic stop of Herman's
vehicle because the latter was traveling at seventy-eight miles per hour in a sixty-five mile
per hour speed zone on Interstate 20 in Harrison County. The stop occurred during the
early morning hours of January 3, 2004. Shortly after pulling out of his stationary position
to pursue Herman, Bryan saw Herman's car swerve in his lane of travel. This swerve was
not caught on the videotape of the traffic stop, and Bryan did not observe any further
swerving or drifting action of Herman's vehicle. 
          Herman used his blinker to indicate his exit from the interstate, and he stopped on
a less-traveled exit ramp off Interstate 20. When Herman exited his car, Bryan noticed
Herman's appearance to be what the former described as "unsteady." Bryan then noticed
Herman's eyes were bloodshot and looked "droopy." Bryan also smelled alcohol on
Herman's breath. Bryan asked Herman to perform three field sobriety tests.
          Bryan first checked Herman's eyes to detect the presence of a pronounced
horizontal gaze nystagmus (HGN). According to Bryan, Herman showed distinct
nystagmus at maximum deviation in both eyes, the onset of nystagmus before forty-five
degrees in both eyes, and the lack of smooth tracking in both eyes. Bryan therefore
concluded Herman showed six clues out of six for the presence of impairment-level alcohol
in Herman's system. Based on the high percentage of clue indicators, Bryan concluded
Herman had failed this first field sobriety test. 
          Bryan next asked Herman to perform the walk and turn test. According to Bryan,
Herman failed to maintain the "instructional stance" while Bryan was demonstrating to
Herman how to perform the test. Herman also took an incorrect number of steps on the
first part of the test, missed touching heel-to-toe on each of the eight steps he took on the
first part of the test, made an improper turn, and missed touching heel-to-toe on six of the
nine steps on the second half of the test. Based on these errors, Bryan concluded Herman
had failed the walk and turn test.
          The final roadside test Bryan asked Herman to perform was the one-legged stand
test. According to Bryan, Herman made an error in counting, put his foot down twice, and
swayed during the test. Based on these errors, Bryan concluded Herman had failed the
test. And, based on the cumulative evidence Bryan had, the officer concluded Herman
was intoxicated and arrested him for driving while intoxicated. A subsequent inventory
search of Herman's vehicle uncovered half of a six-pack of beer in the back seat of
Herman's car. 
          Once at the jail, Bryan asked Herman to perform several more field sobriety tests. 
This testing showed, according to Bryan's testimony, that Herman again exhibited six of
six clues during HGN testing, that Herman could not successfully repeat the alphabet, and
that Herman swayed during a Romberg balance test. Bryan considered each of these
failures to be further evidence Herman was intoxicated. Herman also refused to take an
Intoxilyzer test. And during a subsequent interview, Herman admitted he had consumed
three or four 12-ounce beers at a casino in Shreveport earlier that evening. He also said
the last time he ate was at 10:00 a.m. the previous day. 
          The State argued at trial that the weight of the evidence favored a finding by the jury
that Herman was legally intoxicated at the time Bryan observed Herman operating his
motor vehicle. 
Evidence Discounting a Finding of "Intoxication"
          In contrast, the jury also heard testimony that the roadside tests were not performed
on level ground, which might make the tests more difficult to perform (and thus explain
Herman's poor roadside performance on certain tests). Herman had conversed with Bryan
during the ride from the traffic stop site to the jail, and that conversation had been
intelligent and understandable. Bryan conceded Herman had exercised good judgment
by choosing to stop on an exit ramp rather than the shoulder of a busy interstate. This
evidence also suggested that Herman had not lost the normal use of his mental faculties.
          Herman then testified in his own defense. He told the jury that a childhood friend
had been killed as a result of drunk driving, and that event had caused Herman to make
a profound life choice to not ever drive when he is intoxicated. Herman said that he had
consumed a total of no more than four or five beers during the entire day, none of them in
quick succession, before being stopped by Bryan; therefore, according to the normal rate
a body metabolizes a drink, he could not have been intoxicated. 
          To explain what Bryan had described as a poor performance on the field sobriety
tests, Herman also told the jury he had not slept in almost nineteen hours, had slept only
six hours the previous evening, and was very tired when he had to perform the roadside
tests. He suggested that his high blood pressure condition contributed to Bryan's finding
of nystagmus in Herman's vision. Herman's attorney was also able to suggest to the jury
that Herman had an eye condition and had been around cigarette smoke at the casinos,
either of which might explain why Herman had "bloodshot" eyes. The attorney and
Herman also emphasized Herman did not appear to be "stumbling drunk" on the
videotape, did not have to lean on the vehicles to support himself, and had been courteous
to the officer during the entire proceedings. And, in assessing his performance on the
roadside field sobriety tests, Herman testified he believed he had done a passing job on
the tests. Ultimately, however, the jury sided with the State's assessment of the weight of
the evidence. 
Application of Law to Facts
          After reviewing all the evidence both supporting and contradicting the jury's verdict,
we cannot say the great weight of the evidence is against the jury's finding that Herman
had lost the normal use of his mental or physical faculties by reason of the introduction of
alcohol into his system at the time he was arrested. Nor can we conclude the jury's verdict
was manifestly unjust. Accordingly, we overrule Herman's point of error and affirm the trial
court's judgment.
 
                                                                           Donald R. Ross
                                                                           Justice


Date Submitted:      September 6, 2005
Date Decided:         September 7, 2005

Do Not Publish



w the officer to reasonably conclude that
the person detained actually is, has been, or soon will be engaged in criminal activity. United States
v. Sokolow, 490 U.S. 1, 10 (1989). 
            The second prong of Terry requires the scope of the detention to be "like any other search,
be strictly circumscribed by the exigencies which justify its initiation." Davis, 947 S.W.2d at 243
(citing Terry, 392 U.S. at 25–26). The officer, however, must diligently pursue a means of
investigation that lasts no longer than is necessary and should be the "least intrusive means
reasonably available." Davis, 947 S.W.2d at 245. 
            Under the first prong of Terry, we must determine if the further detention of Garza was
reasonable. A law enforcement officer may rely on information, obtained in the course of his or her
contact with a citizen, in justifying further detention. Powell, 5 S.W.3d at 375. The officers
admitted they had concluded the traffic stop by the time consent was acquired to search Garza's
residence and adjacent vehicles. Any continued detention must be based on specific, articulable facts
which would warrant a person of reasonable suspicion to believe the detainee was or would soon be
engaged in criminal activity. Davis, 947 S.W.2d at 244–45. In order to continue to detain Garza,
specific, articulable facts must have allowed the officers to develop a reasonable suspicion that
additional criminal activity was occurring. 
            There were sufficient specific, articulable facts to justify reasonable suspicion of drug
activity. Monfort had received an anonymous tip that drug activity was occurring at 8823 Dirby,
which was Garza's residence. Monfort testified that he had verified Garza resided at that address and
that one of the vehicles in the yard of the residence belonged to Christina Garza, who was married
to Ezequiel Garza. Monfort had also learned before the detention that Ezequiel Garza had previously
been convicted for a drug offense, had been deported, and was in the country illegally. Further, the
dog alerted to the presence of narcotics at the front door and the garage door of the residence at
8823 Dirby. The trial court did not abuse its discretion in finding that these facts were specific and
articulable facts sufficient to create reasonable suspicion of drug activity. 
            Garza argues his situation is analogous to Herrera v. State, 80 S.W.3d 283, 287 (Tex.
App.—Texarkana 2002, pet. ref'd), which found Herrera's detention unreasonable due to the lack of
reasonable suspicion. Because there is reasonable suspicion, this case is distinguishable from
Herrera. In Herrera, the defendant was pulled over for a traffic violation. Id. Although the officers
did not conduct an investigation of the traffic violation, they detained Herrera until a Spanish-speaking officer arrived to request consent to search Herrera's vehicle. Id. at 288–89. When the
Spanish-speaking officer arrived, Herrera, who did not speak English, consented to the search of his
vehicle. Id. at 287. During the subsequent search, the officers discovered a controlled substance. 
Id. In Herrera, no evidence of reasonable suspicion of any other criminal activity was presented
during the suppression hearing. Id. at 290–91 (op. on reh'g). Therefore, the detention of Herrera
beyond the time necessary to investigate the traffic offense was unreasonable. Id. at 288–89. As
discussed above, in this case, the State presented evidence of specific, articulable facts creating
reasonable suspicion that Garza was involved in criminal activity. Thus, the trial court did not abuse
its discretion in finding the further detention of Garza reasonable.
            The issue then becomes whether the officers' transport of Garza to his residence was an
unreasonable intrusion. Under the second prong of Terry, the temporary detention of Garza must
be reasonable. "An investigative detention must be temporary and last no longer than is necessary
to effectuate the purpose of the stop." Davis, 947 S.W.2d at 245; see Florida v. Royer, 460 U.S. 491,
500 (1983); see also Herrera, 80 S.W.3d at 287. "The investigative methods employed should be
the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short
period of time." Davis, 947 S.W.2d at 245 (quoting Royer, 460 U.S. at 500).
            The United States Supreme Court has indicated that a nonarrest detention made on reasonable
suspicion can be rendered unreasonable by excessive movement of the suspect, i.e., the movement
from a field location to a station house is excessive. See Hayes v. Florida, 470 U.S. 811 (1985);
Dunaway v. New York, 442 U.S. 200 (1979). In Royer, the United States Supreme Court in a
plurality decision held that movement of approximately forty feet was excessive. Royer, 460 U.S.
491. The Supreme Court's concern focused on movement unrelated to any legitimate law
enforcement objective which significantly changed the nature of the detention. In Royer, the suspect
was detained on a busy airport concourse with the suspicion that he was transporting narcotics. Id.
at 494. The suspect was moved a distance of approximately forty feet to a small office removed
from public view. Id. The Supreme Court held that the movement changed the nature of the
detention by placing the defendant in a small room essentially under the control of the officers and
removing the detention from public view. Id. at 496. The Supreme Court further reasoned that the
movement was unrelated to the objective of the detention of searching Royer's luggage, which could
have just as easily been searched on the concourse. Id. Although the Supreme Court noted the
movement increased the likelihood of Royer granting consent, it held increasing the likelihood of
consent was not a legitimate purpose. Id. Therefore, the Supreme Court held the methods employed
in Royer were not the least intrusive available. Id.
            Although Garza's detention is distinguishable from Royer, we note there are some
similarities. In Royer, the suspect was detained less than fifteen minutes. Id. at 495. Likewise,
Garza was detained at most fifteen minutes. Garza was moved a greater distance than forty feet. 
Further, Garza was surrounded by a number of officers. However, there are three important
differences between Garza's detention and Royer. We cannot say that the movement changed the
nature of the detention. Garza was moved from being detained in the street to being detained in front
of his house. Unlike Royer, this move did not create an environment which removed him from
public view or placed him more extensively under the control of the officers. Second, unlike the
situation in Royer, the movement did facilitate greater convenience in conducting the search. The
search of the residence could be conducted with greater convenience if Garza was transported to the
residence. Thus, the movement of the suspect was related to a legitimate law enforcement objective. 
Additionally, Garza orally consented to a search of his residence before any movement, whereas in
Royer, the consent came only after the accused was moved into a small room. 
            Further, we note that several Texas courts have held that transporting an individual to the
scene of the alleged crime or another location is not an unreasonable intrusion. Joseph v. State, 865
S.W.2d 100, 103 (Tex. App.—Corpus Christi 1993, pet. ref'd) (least intrusive means available to
investigate suspicion); Davis v. State, 783 S.W.2d 313, 317 (Tex. App.—Corpus Christi 1990, no
pet.) (reasonable investigative detention involving transporting suspect to the scene two and a half
miles away); Dittoe v. State, 935 S.W.2d 164, 166–67 (Tex. App.—Eastland 1996, no pet.) (suspect
transported a few blocks to the victim's house). Because this case is distinguishable from Royer, we
hold that the transportation of Garza to his residence was not unreasonable.
Conclusion
            The trial court did not abuse its discretion in denying the motion to suppress. Although the
officers stopped Garza for a traffic violation, the State presented evidence that the officers had
specific, articulable facts creating reasonable suspicion that Garza was engaged in other criminal
activity. In the circumstances of this case, the movement of the suspect back to his residence was
not unreasonable. The trial court did not abuse its discretion in finding that the further detention and
the scope of the investigation were reasonable.
            We affirm the judgment of the trial court.
 

                                                                        Jack Carter
                                                                        Justice

Date Submitted:          March 12, 2004
Date Decided:             March 18, 2004

Do Not Publish