

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-15-00419-CR

ELVIS ELVIS RAMIREZ-TAMAYO, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 108th District Court
Potter County, Texas
Trial Court No. 69523-E, Honorable Douglas Woodburn, Presiding

October 5, 2016

## DISSENTING OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

The majority concludes that the suspicion formed by the Potter County deputy sheriff after his traffic stop of appellant was unreasonable and his continued detention of appellant thus unlawful. I agree with my colleagues that the lawfulness of prolonging appellant's detention beyond the completion of the traffic stop and issuance of the warning ticket depends on the existence of a reasonable suspicion of criminal activity beyond the speeding violation for which he was stopped. *See Rodriguez v. United States*, 2015 U.S. LEXIS 2807, 135 S. Ct. 1609, 1612, 191 L. Ed. 2d 492 (2015). But to

me, the experienced deputy's[1] suspicion that the presence of contraband drugs inside the passenger door accounted for appellant's action of reaching across the passenger seat to open the door rather than simply lowering the window[2] was reasonable under all the circumstances, which included the following: appellant was traveling east on I-40 in a Florida rental car; there was no observable reason the electric windows on the nearly-

[1] The deputy's direct testimony at the motion to suppress hearing contains the following exchanges:

Q. Okay. And how long have you been employed with the Potter County Sheriff's Office?
A. For nine years.
Q. Okay. And what are your job duties?
A. Right now, I'm assigned to the Criminal Intelligence Unit and I mainly work the highway and interdiction functions.
Q. Okay. And is that sort of like patrolling; that you're out on the streets in your car every day?
A. Yes, ma'am.
Q. And are you a licensed peace officer with the State of Texas?
A. Yes.
Q. And have you been a licensed peace officer the entire time that you've been hired with the Potter County Sheriff's Office?
A. I was a jailer for a short period, about two years -- well, it was about a year -- and then I got my peace officer license.
Q. Okay. So how long have you been a peaceofficer in Texas?
A. Over eight years.

[2] Q. Okay. And when you approached the passenger's side of this car, what happened?
A. The first thing I remember is when I approached, the person appeared confused and couldn't roll down the passenger window and it never rolled down. He ended up opening the door.
Q. Okay. Did he attempt to roll down the window at all?
A. No.
Q. Okay. And so he opened the door on the passenger's side?
A. Yes.
Q. Meaning, he leaned across the car to open that door to talk to you?
A. Yes; correct.
Q. Did you find that strange?
A. Yes, I did.
Q. Why is that?
A. Most cars, they have electric windows, especially newer cars, and they have buttons on the driver's door that operate the window, so it would be easier just to hit the button and roll down the window to talk to me.
Q. Okay. And how old of a car is this that we're talking about?
A. It was a 2014; it was brand-new at the time.
Q. Okay. Did you see any damage to the car that would explain why the windows didn't function properly?
A. No ma'am.

2

new car would not operate; the deputy had seen instances on I-40[3] ("I've seen it a few times, yes") in which traffickers had packed drugs inside a vehicle's doors; on his approach to the car the deputy became aware of the presence of the odors of strong cologne and cigarette smoke, and his experience showed him that traffickers will "use cover odors to cover the odor of the drugs they're hauling";[4] and appellant exhibited signs of extreme nervousness.[5] The objective facts the deputy articulated were

---

[3] Asked how appellant's failure to roll the window down related to "drug trafficking on I-40," the deputy answered:

A.      It is -- the doors of the vehicle, there's a void in between the inside panel and the outside of the door and it's very commonly – it's a void used to traffic drugs. They'll stuff the doors full and those naturally would. . .

The exchange continued:

Q.      And so have you commonly seen people that are trafficking drugs to stuff the passenger doors, I guess, between the plastic and the metal of that door?
A.      Yes.
Q.      Okay. And in your training and experience, dealing with I-40, you've seen that a few times or many times?
A.      I've seen it a few times, yes.

[4] Q.      Okay. So, Officer, I know you've talked about why the window rolling down was suspicious; what other factors did you consider on your traffic stop that gave you reasonable suspicion?
A.      In my traffic stop, after I was speaking with the driver, he had a lot of cologne on; it was a very overwhelming smell of cologne.
Q.      Okay. Why in your training and experience would that tend to indicate that he might be trafficking drugs?
A.      They'll use cover odors to cover the odor of the drugs they're hauling.
Q.      Okay. And so when you were standing by the car was this an overwhelming odor that you felt was more than most people?
A.      Yes; correct.
Q.      What else did you notice about the car?
A.      I also noticed there was cigarette ashes all over the vehicle; they were in the floorboards and everything and it appeared that he was chain-smoking while he was driving.
Q.      Okay. Did you notice the odor that went along with chain-smoking or did you notice just the physical evidence?
A.      I could smell the cigarette odor also, yeah.

[5] Q.      Okay. What about the Defendant's demeanor when you were speaking with him on the traffic stop?
A.      He appeared nervous and excited.
Q.      Officer, is it normal that people are a little nervous and excited when you pull them over?
A.      A little bit, yes.

specific, and the nature of his suspicion was particularized. *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989); *Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012) (descriptions of reasonable suspicion standard). My colleagues conclude otherwise, but their analysis seems to me to stem from a failure to view the record in the light most favorable to the trial court's ruling and to assume the court made implicit findings of fact supporting its ruling that are supported by the record. *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005) (both stating standard for review of record without findings).

For those reasons, I find myself unable to agree with the majority's conclusion. I would affirm the trial court's denial of appellant's motion to suppress, and the trial court's judgment. Because the Court does not, I respectfully dissent.

James T. Campbell
Justice

Publish.

---

Q. Okay. And is there -- I guess, is there a scale or how do you judge the difference between what you would consider a normal nervous behavior and what this Defendant did?

A. It's – it's more of an extreme nervousness of just -- they have a lot of body movements and stuff that are involuntary that just kind of indicates that they're more nervous.

Q. Did the Defendant show any body movements that would indicate severe nervousness?

A. Yes.

Q. Okay. What did he do?

A. He was not able -- he was sitting in the front passenger seat of my patrol vehicle while I was speaking with him and he could never get comfortable. He was constantly shifting in the seat and crossing his arms and he couldn't sit still, even for just a few minutes.

Q. Okay. And was this after you told him that you were going to give him a warning for the speeding?

A. Yes; correct.

Q. And so telling someone that they're just going to get a warning and they're not going to get a ticket, does that in your experience tend to lower or raise their nervousness?

A. It usually lowers it.

Q. Okay. And did it lower his nervousness in this case?

A. No, ma'am.

4