Please note: We have sua sponte removed this case from the accelerated calendar.
 OPINION.
In this appeal we are asked to visit again the issue of when a police officer, acting on a tip of erratic or drunken driving relayed over the police radio, has reasonable suspicion to justify a brief investigatory stop of a vehicle appearing to match the broadcast description. It is an issue that pits the interest of the Fourth Amendment in protecting individual citizens from arbitrary police action against society's interests in protecting its highways from the lethal presence of drunk drivers. For the reasons that follow, we hold that, under the totality of the circumstances, the police stop of the vehicle driven by the defendant-appellant, Kenneth Marsh, was based upon reasonable suspicion and therefore satisfied both constitutional and societal interests. The order of the trial court granting his motion to suppress is, therefore, reversed.
 I.
On May 16, 1998, at approximately 5:15 p.m., Officer Jonathan Cole of the Colerain police department received a radio broadcast of a "reckless operator" in a Dodge pickup truck travelling eastbound on I-275, approaching Hamilton Avenue. The broadcast gave a description of the driver as a white male in his late twenties and advised that the vehicle had been weaving over all three lanes, almost striking a Time Warner Cable Company truck.
The broadcast, which was transmitted from the Hamilton County "Comp" Center, resulted from an earlier 911 call to the police. A tape of the 911 call was admitted at trial. The caller was driving behind the vehicle and describing the action as it occurred. In addition to describing its erratic operation and the near collision, the caller gave specific exits and mile markers to indicate the vehicle's location. The caller also gave a partial license-plate number but indicated that she was too afraid for her safety to get closer to the Dodge pickup. The call concluded with the caller indicating that the pickup had pulled over and stopped on the median as she drove by.
After listening to the broadcast, Officer Cole drove onto the interstate. According to Officer Cole, within "a couple minutes" he spotted Marsh's red pickup truck stopped on the right shoulder. He stated that even if he had not received the radio broadcast, it was his normal practice, upon observing a stopped car on the shoulder, to pull over and "see if they're broken down, or if they have any kind of problem or anything."
Officer Cole testified that, after pulling in behind Marsh's stopped truck, he turned on his lights and started to leave his cruiser. At that point, he testified, Marsh began pulling forward. According to Officer Cole, he then got back in the cruiser and followed Marsh for a distance of approximately one hundred yards until he again stopped. Officer Cole then exited from his cruiser for a second time and, after walking up to Marsh's truck, spoke to him through the window, which was already rolled down. He stated that he first asked Marsh if everything was all right, to which he responded affirmatively.
Officer Cole testified that when he informed Marsh that someone had called 911 to report his erratic driving, Marsh denied driving in that manner. He described Marsh as appearing "confused" and having trouble locating his driver's license when he was asked for it. He stated further that he detected an odor of alcohol from Marsh, and that Marsh's speech was slurred. He testified that he concluded that Marsh should be subjected to field sobriety tests based upon the radio dispatch, their conversation, and the smell of alcohol. Officer Cole then went back to his cruiser in order to process Marsh's identification through the computer.
Because Officer Cole was a canine handler, he turned the case over to Officer Richter, who arrived within three or four minutes. When Officer Richter arrived, Officer Cole explained the situation to him. Officer Richter testified that when he spoke to Marsh, he had a strong odor of alcohol on his breath and his speech "appeared to be somewhat slurred." He testified that Marsh staggered as he got out of the truck to perform a series of field sobriety tests, which he failed. He testified further that it was apparent that Marsh had urinated on himself, and that his eyes were bloodshot and watery. At that point, Officer Richter testified, he concluded that Marsh had been driving while impaired and placed him under arrest.
Marsh was charged with driving under the influence in violation of R.C. 4511.19. Prior to trial, he filed a motion to suppress. His basis for the motion was that the police lacked reasonable suspicion to stop his vehicle because they had not independently observed, prior to the stop, any evidence of drunken driving to corroborate the 911 call relayed over the radio. The trial court granted the motion. In its written findings of fact and conclusions of law, the trial court explained the reason for its decision as follows:
 [Officer Cole] had no independent reasons to stop [Marsh]. The broadcast, based upon an uncorroborated tip, said a red truck driving near Hamilton Avenue exit was a possible DUI. Officer Cole saw a red truck, stopped on the berm near the Hamilton Avenue exit. Cole observed the car in motion for approximately a hundred feet before he stopped it. The Officer did not observe any traffic violations, erratic or impaired driving, or any other non-arrestable offenses that met the Fourth Amendment standards for a stop.
 II.
The only issue in this appeal is whether Office Cole had reasonable suspicion to justify the stop of Marsh's pickup truck. For the reasons that follow, we hold that he did.
"Reasonable suspicion," as this court has noted, is a term of art not "`readily, or even usefully reduced to a neat set of legal rules.'" State v. Ramey (Aug. 14, 1998), Hamilton App. No. C-970588, unreported, quoting United States v. Sokolow (1989),490 U.S. 1, 7, 109 S.Ct. 1581, 1585. As we observed in Ramey:
 The term connotes something less than probable cause, but something more than an "inchoate or unparticularized suspicion or `hunch.'" Terry [v. Ohio (1968), 392 U.S. 1], 28, 88 S.Ct. [1868] at 1883. As noted by Justice Brennan: "Action based merely on whatever may pique the curiosity of a particular officer is the antithesis of the objective standards requisite to reasonable conduct * * *." Delaware v. Prouse (1979), 440 U.S. 648, 654-655, 99 S.Ct. 1391, 1396
(Brennan, J., dissenting). In short, there must be "some minimal level of objective justification" for the stop. Id., quoting INS v. Delgado (1984), 466 U.S. 210, 217, 104 S.Ct. 1758, 1763.
The determination of whether reasonable suspicion exists to justify a stop is based upon the totality of the circumstances.United States v. Cortez (1981), 449 U.S. 411, 417, 101 S.Ct. 690,695: Sokolow, supra, at 7, 109 S.Ct. at 1585. A major, yet common misperception — one in which the trial court apparently engaged — is that the police must observe the defendant actually breaking the law before they possess reasonable suspicion to stop him or her for questioning. This has never been the rule. In Terry v. Ohio,supra, the case in which the United States Supreme Court first formulated the standard for an investigative stop, an experienced police detective was justified in stopping the defendant and his companions based merely upon his observation that they were hovering about a street corner for an extended length of time, pausing to stare in the same store window and then conferring immediately thereafter — all of which caused the detective to suspect that they were contemplating a daylight robbery.
It is entirely possible, therefore, that conduct which is perfectly legal may nonetheless justify a reasonable suspicion that criminal activity is afoot. Ramey, supra; Sokolow, supra, at 9, 109 S.Ct. at 1586, citing Reid v. Georgia (1980), 448 U.S. 438,100 S.Ct. 2752. The conduct need only be unusual, not criminal. The protection against the police acting out of curiosity, or on a "unparticularized suspicion" or "hunch," is that the police officer must be able to point to specific and articulable facts that, in light of his or her experience, support "specific reasonable inferences" of criminal activity.
As we noted further in Ramey, the ultimate issue under the Fourth Amendment, assuming the existence of some objective level of individualized suspicion, is whether the warrantless stop is "reasonable." The resolution of this issue here requires a balancing of the driver's interests in privacy and freedom of movement against the state's interest in protecting its highways from drunk drivers. As the United States Supreme Court has observed, "No one can seriously dispute the magnitude of the drunken driving problem or the State's interest in eradicating it." Michigan Department of State Police v. Sitz (1990),496 U.S. 444, 451, 110 S.Ct. 2481, 2486. As the Court pointed out in Sitz,
the statistical evidence before it demonstrated that drunk drivers caused 25,000 deaths and over five billion dollars in property damage annually. Id.
As the trial court correctly found, the stop in this case did not occur until Marsh began to pull away from Officer Cole's cruiser on the right berm or shoulder, causing Officer Cole to switch on his lights and stop him a hundred yards distant. At that point, Officer Cole had received a radio broadcast describing a red pickup truck as one involved in a possible DUI, and then discovered Marsh's red pickup truck along the reported route, off the highway, and stationary for no apparent reason. No one can deny that it is unusual for a vehicle to be stopped on the shoulder of an interstate. No one can deny, either, that drunk drivers frequently (although, perhaps, not frequently enough) pull over when they either feel sick, pass out, need to urinate, or realize their incapacity to drive. Under these circumstances, it is clear that Officer Cole had at least some "some minimal level of justification" to suspect that the vehicle was being operated by one in an impaired state. Furthermore, as if that were not enough, the vehicle then began to pull away from Officer Cole just as he pulled in behind it and began to exit from his cruiser. Regardless of whether Marsh actually saw the officer, this apparent attempt at flight only added to the suspicion already created concerning the vehicle and its driver. Indeed, at this point, Officer Cole would have been remiss in his duties if he hadnot gotten back into his cruiser and stopped the vehicle so that the driver could be questioned.
Marsh primarily challenges the stop as one based, at its core, on an anonymous tip, and therefore inherently unreliable without some further corroboration. That reasonable suspicion may be formed on the basis of a tip was made clear by the United States Supreme Court in Adams v. Williams (1972), 407 U.S. 143,92 S.Ct. 1921. Further, the Ohio Supreme Court has held that police may rely on information broadcast over the police radio for probable cause to make an arrest, State v. Fultz (1968), 13 Ohio St.2d 79,234 N.E.2d 593, certiorari denied (1968), 393 U.S. 854,89 S.Ct. 95, and, thus, by extension, for reasonable suspicion to make a stop. Ramey, supra.
As for the anonymous nature of the tip, this court observed in Ramey that even "tips from anonymous sources, imparted in a clandestine and therefore suspicious manner," are not per se unreliable. Id., citing Illinois v. Gates (1983), 462 U.S. 213,103 S.Ct. 2317; Alabama v. White (1990), 496 U.S. 325,110 S.Ct. 2412. However, such tips do require corroboration by independent police work given their unknown origin. Id.
As we have already noted, the tip that led originally to the police broadcast was a 911 call. Although the taped conversation evidences a high level of cooperation by the caller as she responded to the 911 operator's questions, so that there is no reason to presume that she would not have identified herself had she been asked, she was not asked to do so. Technically, therefore, this case involves an anonymous tip. Even so, however, we hold that Officer Cole's observations after he encountered Marsh's vehicle provided sufficient corroboration to justify a brief investigatory stop. Again, it bears emphasis that the corroboration need not consist of criminal activity. Here, after receiving the tip as it was broadcast over the radio, Officer Cole proceeded to the interstate and discovered a vehicle matching the description given by the caller, stopped for no apparent reason off the side of the road. This unusual circumstance alone would have been sufficient to corroborate the tip. The fact that the vehicle then began to move away just as he was pulling over to check it out, raising the appearance of flight and thus an inference of guilt, only served to further corroborate the tip.
Marsh's argument in his brief that "[m]erely locating the same vehicle which the tipster describes cannot serve the purpose of verifying the accuracy * * * of the tipster's information" is inapposite. This is not a case in which the police located the vehicle and observed nothing else unusual or suspicious. A vehicle stopped on the side of the interstate and then moving away just as the police pull in behind it is inherently suspicious — it certainly does not reflect normal behavior — and that alone may indeed have supported a stop even absent the earlier radio broadcast.
Further, we reject Marsh's argument that a brief investigatory stop of a vehicle is more than a minimal intrusion because it automatically entitles the police officers to conduct field sobriety tests and search the inside of the vehicle. This is simply not true. As we noted in Ramey, such stops generally consist of "stopping the vehicle and approaching the driver for the purpose of either asking questions or, in the case of a suspected DUI, more closely observing the driver's condition."Ramey, supra. Without further evidence of criminal activity or some threat to the officers' safety, the police are limited to observing only what is in plain view and cannot further detain the driver unless their observations give them additional justification for performing field sobriety tests.
Accordingly, we hold that, as a matter of law, Officer Cole had reasonable suspicion to justify the investigatory stop of Marsh's vehicle. Based upon what he and Officer Richter then observed concerning Marsh's physical condition, the officers were justified in subjecting him to a series of field sobriety tests. Marsh's failure to satisfactorily perform those tests then fully justified his arrest.
Accordingly, the judgment of the trial court is reversed, and this case remanded to the trial court for further proceedings.
Judgment reversed and cause remanded.
Doan, P.J., and Painter, J., concur.
Please Note:
The court has placed of record its own entry in this case on the date of the release of this Opinion.