DECISION.
The defendant appellee, Kevin Hawkins, was indicted for a single count of aggravated possession of drugs. The indictment specified that on July 2, 1999, Hawkins "did knowingly obtain, possess or use a Schedule II controlled substance, to wit: morphine, in an amount less than or equal to the bulk amount" contrary to R.C. 2925.11 (A).
The case was originally within the purview of the drug court, but was transferred to the docket of a judge of the general division of the court of common pleas to hear a motion to suppress evidence that had been filed by Hawkins. The motion was heard on September 3, 1999. The evidence adduced at that hearing is, for the most part, without conflict.
On July 2, 1999, at about 3:45 p.m., a uniformed Cincinnati police officer on routine patrol in a marked vehicle was contacted by radio by a fellow officer, assigned to an undercover unit, to "initiate a traffic stop" of a white Ford pickup truck.
The uniformed officer observed a vehicle matching that description, approached it from the rear, and activated the overhead lights on his police car. When the truck stopped on the left side of the street, Hawkins, the sole occupant, obeyed the officer's request to get out and produce evidence of his identification. Hawkins then consented to a search of his person, which produced the evidence sought to be suppressed, a small, brown vial containing morphine tablets along with several other pills such as Tylenol. At that point, the undercover officers arrived at the scene.
One of those officers testified that he and a partner were traveling in an unmarked vehicle at a location he described as being a "high drug area" when he saw a white Ford pickup truck stationary at the curb of the street. From a distance of some 100 feet, he watched the truck to "see what he [the driver] was going to do." The officer testified,
 Several male blacks walked up to the pickup truck, leaned in the passenger's window, leaned out, looked around which made me very suspicious; another male black leaned in again.
 You can kind of see through the rear window, I guess, of the pickup truck. The driver also made a — leaned forward and tilted to the side and sat there for a little bit, then, pulled away from the curb without signaling, drove off.
 The truck made a right turn without signaling as the non-uniformed officers followed it. The officer who called ahead to have the truck stopped was asked, "What was the reason to have him stopped: He didn't signal?"
With what we see as complete candor, the officer answered, "No, that was — There were two traffic violations at least but the reason that I wanted to stop him was for a drug investigation."
After being given his Miranda rights, Hawkins told the officers that he had no prescription for the pills but had gotten them from his uncle as medication for a "bad back."
Hawkins testified that he was at the place where he was first seen by police to deliver some money to his daughter who lived there. He said that she entered his truck momentarily, and that, after giving her the money,[1] he left the curb. He admitted that he gave the uniformed officer consent to search, that the pills were recovered from the left front pocket of the pants he was wearing, and that he had the pills "for pain for my real bad back."
The court gave its ruling granting Hawkins's motion immediately from the bench, stating inter alia the following:
 I am accepting their version of what happened for this ruling even if it was a high-drug-activity area, to giving them reasonable articulable suspicion to stop the individual, it is not illegal to talk to people on the, corner pulling your car over and approaching your automobile where you talk to them through the window.
The state's singular assignment of error is that the court erred as a matter of law in granting the motion to suppress the evidence recovered incident to the search. It is premised on these propositions:
 The trial court erred in using the "probable cause" standard in evaluating the propriety of the initial stop.
 Pursuant to Terry, the officers had a reasonable, articulable suspicion that the defendant was engaged in criminal activity. The stop and subsequent consent search of defendant were entirely proper.
 With respect to the first branch of the state's assignment, the court said this:
 I think your motion to suppress is well taken. It will be granted: There is no probable cause for this stop and for that reason — even though he consented to the search, it is a fruit of a poisonous tree. It will be suppressed.
However, this reference to "probable cause for this stop" was preceded by the reference to "reasonable, articulable suspicion to stop" as the applicable standard in law by which to gauge the propriety of the stop. Therefore, we take the court's remark in the second instance to have been improvident, an inadvertence, and not indicative of error in resolving the issue.
The second branch of the state's argument broaches the core issue to be decided here: did the non-uniformed officers have a reasonable suspicion of criminal activity on the part of Hawkins?
The holdings made by this court in State v. Marsh (Sept. 3, 1999) Hamilton App. Nos. C-980788 and C-980789, unreported, at 5, are pertinent to that question. Judge Robert H. Gorman, writing for the panel, noted the following:
 "Reasonable suspicion," as this court has noted, is a term of art not "readily, or even usefully reduced to a neat set of legal rules." State v. Ramey (Aug. 14, 1998), Hamilton App. No. C-970588, unreported, quoting United States v. Sokolow (1989), 490 U.S. 1, 7, 109 S.Ct. 1581, 1585. As we observed in Ramey:
 "The term connotes something less than probable cause, but something more than an "`inchoate or unparticularized suspicion or hunch.'" Terry [v. Ohio (1968), 392 U.S. 1], 28, 88 S.Ct [1868] at 1883. As noted by Justice Brennan: "Action based merely on whatever may pique the curiosity of a particular officer is the antithesis of the objective standards requisite to reasonable conduct * * *." Delaware v. Prouse (1979), 440 U.S. 648, 654-655, 99 S.Ct. 1391, 1396 (Brennan, J., dissenting). In short, there must be "some minimal level of objective justification" for the stop. Id., quoting INS v. Delgado
(1984), 466 U.S. 210, 217, 104 S.Ct. 1758, 1763."
The determination of whether reasonable suspicion exists to justify a stop is based upon the totality of the circumstances. United States v. Cortez (1981), 449 U.S. 411, 417,101 S.Ct. 690, 695; Sokolow, supra, at 7, 109 S.Ct. at 1585.
The Ohio Supreme Court visited the same problem in decidingMaumee v. Weisner (1999), 87 Ohio St.3d 295, 720 N.E.2d 507. Justice Cook stated this in her opinion, with which a majority of the court concurred:
 "[I]f the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." Hensley, 469 U.S. at 232, 105 S.Ct. at 682.
Many courts in Ohio and other jurisdictions have interpreted Hensley and Whiteley to require proof at the suppression hearing that the officers issuing the dispatch
possessed sufficient knowledge of facts or information to justify the stop, where the stopping officer himself did not. See State v. Hill, supra; State v. Ramsey (Sept. 20, 1990), Franklin App. Nos. 89AP-1298 and 89AP-1299, unreported. Other Ohio courts have held instead that an officer's statement that he relied upon a dispatch is, by itself, sufficient to justify the stop, regardless of the knowledge of the officer issuing the dispatch. See, e.g.,State v. Good (1987), 37 Ohio App.3d 174, 525 N.E.2d 527;State v. Janda (Apr. 14, 1993), Lorain App. No. 92CA005416, unreported. See, also, State v. Penn (Aug. 2, 1994), Franklin App. No. 93AP-953, unreported.
We believe the latter approach is inconsistent with United States Supreme Court precedent and fails to adequately protect the citizen's Fourth Amendment rights. Accordingly, we clarify here that where an officer making an investigative stoprelies solely upon a dispatch, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity.
The terminal sentence in the paragraph quoted constitutes the syllabus in Maumee.
Justice Cook addressed the proscriptions of the Fourth Amendment in the same terms employed by Judge Gorman in State v.Marsh, supra:
 The proscriptions of the Fourth Amendment impose a standard of reasonableness upon the exercise of discretion by government officials. Delaware v. Prouse (1979), 440 U.S. 648, 653-654, 99 S.Ct. 1391, 1396. "Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. at 654, 99 S.Ct. at 1396. To justify a particular intrusion, the officer must demonstrate "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. at 21, 88 S.Ct. at 1880.
The United States Supreme Court has interpreted the Fourth Amendment to permit police stops of motorists in order to investigate a reasonable suspicion of criminal activity.Id. at 22, 88 S.Ct. at 1880. The reasonable suspicion necessary for such a stop, however, eludes precise definition. Rather than involving a strict, inflexible standard, its determination involves a consideration of "the totality of the circumstances." United States v.Cortez (1981), 449 U.S. 411, 417, 101 S.Ct. 690, 695. Under this analysis, "both the content of information possessed by police and its degree of reliability" are relevant to the court's determination. Alabama v. White
(1990), 496 U.S. 325, 330, 110 S.Ct. 2412, 2416.
The record convinces us that the trial court analyzed, correctly, the complete spectrum of facts, viz., the "totality of the circumstances," and took into account any rational inferences in determining whether the intrusion, the search of Hawkins's person, was reasonably warranted. We are compelled to agree with the trial court that " it is not illegal to talk to people on the corner * * *pulling your car over * * * where you talk to them through the window."
Accordingly, we hold that where, as here, police officers, while directing another officer to stop a vehicle, observe nothing more than a succession of individuals pause briefly beside that vehicle in broad daylight on a well-traveled public thoroughfare, the subsequent stop of that vehicle after it leaves that location is not justified in law.
Having properly concluded that the police had failed to demonstrate that the facts that precipitated, or motivated, the non-uniformed officers to instruct their uniformed fellow officer to stop Hawkins's truck justified a reasonable suspicion that Hawkins was engaged in criminal activity, the trial court was bound inexorably to rule that the fruits of the subsequent warrantless search of his person had to be suppressed.
For the reasons given, the state's assignment of error as posed through both of its branches is not well taken and is overruled.
 ___________________________ Per Curiam.
 Doan, P.J., Gorman and Shannon, JJ.
Raymond E. Shannon, retired, of the First Appellate District, sitting by assignment.
[1] Hawkins's daughter corroborated this in her testimony.