JjMAX N. TOBIAS, JR., Judge.
The defendant, Lawrence Lewis, a/k/a Roland Lewis (“Lewis”), was charged on 1 December 2000, with possession of heroin, a violation of La. R.S. 40:966. On 27 December 2000, he was arraigned and pled not guilty. He filed a motion to suppress evidence, which was denied on 11 April 2000. On 15 May 2001, he withdrew his plea of not guilty and pled guilty as charged pursuant to State v. Crosby, 338 So.2d 584 (1976). He waived delays and was immediately sentenced to five years at hard labor without benefit of parole, probation, or suspension of sentence. The State filed a multiple bill to which the defendant pled guilty. His original sentence was vacated and he was re-sentenced to five years at hard labor without benefit of probation or suspension of sentence. Lewis appeals.

ERRORS PATENT:

The trial court’s minute entry states that the defendant was denied the benefit of parole. La. R.S. 40:966(0(1) does not provide for the denial of parole. However, the sentencing transcript establishes that the defendant was not denied the benefit. The sentencing transcript controls; no error exists. Lewis’ sentence is for five years without the benefit of probation or suspension of sentence only.

_[¿FACTS:

The transcript of the motion to suppress hearing, which took place over several days, establishes the following:
Officer Kyle Hinrichs testified that he was in an unmarked police car with Detective Ryan Lobrano at the corner of Martin Luther King Boulevard and South Johnson *616 Street on 1 November 2001 at 1:15 p.m. assisting Detective Robert Ferrier who was conducting surveillance for narcotics in an area known for drug use. Detective Ferrier observed one man give another man a small plastic bag in exchange for money. He radioed a description of the purchaser (an individual wearing a white T-shirt, blue jeans and a green hat) to Officer Hinrichs and Detective Lobrano and to Detective Cedric Gray and Sergeant Steve Gaudet. Detective Ferrier lost sight of the man. Sergeant Gaudet and Detective Gray saw the defendant sitting on the steps of 3312 Thalia Street, a courtyard in the Calliope Housing Project. The defendant saw the detectives in their unmarked car and ran. At that point in Officer Hinrichs’ recounting the events, the defendant objected on hearsay grounds, and the court sustained the objection.
Officer Hinrichs then testified that Sergeant Gaudet and Detective Gray lost sight of the defendant. Officer Hinrichs and Detective Lobrano arrived in the area and saw Sergeant Gaudet going into a hallway of one of the project’s structures. Sergeant Gaudet chased the defendant to the top of a three-story stairway and found him crouched down. He ordered the defendant to stand. At that point, Sergeant Gaudet said that the defendant said, “You got me. I don’t have it on me any more. I threw down three bags of coke in the grass when I was running from you.” Officer Hinrichs patted the defendant down for weapons, and found a rigid ^object in his sock. Due to his experience in narcotics enforcement, and “knowing the feel and also knowing it’s a commonplace for people to conceal contraband,” he reached into the sock and removed a clear plastic bag, inside whereof were twenty-two foils of an off-white colored powder that was consistent with heroin. Officer Hinrichs arrested the defendant and advised him of his rights. He said,
“At the time of arrest, Sergeant Gau-det and myself believed that it was the individual. It was very similar clothing and physical to the description we received from Detective Ferrier. After I placed Mr. Lewis under arrest for the heroin, I conducted a search incidental to arrest, advised him of his rights, and, at some point after placing him under arrest, Detective Ferrier removed himself from his surveillance position and arrived on the scene. Upon his arrival and him viewing Mr. Lewis, he then advised us that the physical and clothing were very similar to the individual he observed in the narcotics transaction at Martin Luther King and South Johnson, however, Mr. Lewis was not the individual that he had observed.”
On cross-examination, Officer Hinrichs said the description of the defendant had not included height or weight and that the defendant was not found wearing a green hat.
The defense then called Shyra Dabney who said she had been sitting on the steps with a man named “Black” when the police arrived. Black ran. She walked to a nearby driveway when she heard people saying, “They beating him up.” The police detained the defendant for an hour while they took his car keys and tried them in the locks of nearby cars.
Detective Ferrier testified he had been conducting the surveillance because of citizen complaints. He said the defendant was not the man he saw involved in a narcotics transaction, although he closely resembled him. On cross examination, he said that he had given a description of a man wearing a white t-shirt, blue jeans and a green hat, 6'1", thin, and with a brown complexion.
*617 |4The defense called Sergeant Gaudet, who said that when he saw the defendant, he believed him to be the man described by Detective Ferrier. He remembered the defendant sitting next to a woman, but he could not identify her as Ms. Dabney. He identified a picture of the defendant, taken immediately after arrest, wearing a white T-shirt, blue jeans, and a light blue or light green hat. The court noted at that point that the hat was either green or aqua. Sergeant Gaudet said that the defendant gave an address in Eastern New Orleans when he was arrested. Because he was found in the Calliope Housing Project, which is some distance from East New Orleans, the officers tried keys found on him to learn whether they would start any nearby automobiles, although the defendant told them he did not have a car.
Lewis testified he dropped his car off at Mossy Motors on the morning he was arrested and walked to the nearby housing project to visit his cousin while the car was repaired. He identified a receipt for the car. He said the hat he was wearing that day, which he identified in the picture taken of him, was sky blue in color. Just prior to his arrest, as he was standing on a balcony outside his cousin’s apartment, he saw a man running through the project; he assumed that the man was being chased by either someone who had a gun or by the police. He stepped into a hallway of the apartment building. He observed Sergeant Gaudet chasing the man. Sergeant Gaudet asked him which way the man had run. Lewis admitted he smirked at him. Sergeant Gaudet spoke to another officer who had arrived on the scene, then came up the stairway with gun drawn. He told Lewis to “get down.” As Lewis was on his knees, Sergeant Gaudet handcuffed him and said, “You think something is funny? Which way did the f_g guy run?” Lewis denied making a statement about cocaine. The officers ran a computer search on Lewis, told him | ¡¡that he was in danger of being sentenced under the “strike three” law, and that he should “give them some names” to make it “easy on himself.” Lewis denied seeing any drugs until he was at the police station. Lewis admitted to prior convictions including cocaine and weapons charges.

ASSIGNMENTS OF ERROR ONE THROUGH FIVE:

The defendant argues that the trial court erred in denying the motion to suppress.
Police officers may stop a person whom they “reasonably believe is committing, has committed, or is about to commit an offense.” La.C.Cr.P. art. 215.1; Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
In making a brief investigatory stop on less than probable cause to arrest, the police “ ‘must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.’ ” State v. Katie, 96-2650, p. 3 (La.9/19/97), 699 So.2d 879, 881 (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). The police must therefore “articulate something more than “ ‘inchoate and unparticularized suspicion or “hunch.” ’ ” ” United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)). This level of suspicion, however, need not rise to the probable cause required for a lawful arrest. The police need have only “ ‘some minimal level of objective justification....’ ” Sokolow, 490 U.S. 1, 7, 109 S.Ct. at 1585 (quoting INS v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)). A reviewing court must take into account the “totality of the circum *618 stances the whole picture,” giving deference to the inferences and deductions of a trained officer that might well elude an untrained person. Cortez, 449 U.S. at 418, 101 S.Ct. at 695. The court must also weigh the circumstances known to the police ‘not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.’ Id.”
| State v. Wilson, 99-2384, p. 4 (La.App. 4 Cir. 3/15/00), 758 So.2d 356, quoting State v. Huntley, 97-0865, p. 3 (La.3/13/98), 708 So.2d 1048, 1049.
Reasonable suspicion for an investigatory stop is something less than probable cause. It must be determined under the facts of each case whether the officer had sufficient articulable knowledge of particular facts and circumstances to justify an infringement upon an individual’s right to be free from governmental interference. State v. Albert, 553 So.2d 967 (La.App. 4 Cir.1989). The totality of the circumstances must be considered in determining whether reasonable suspicion exists. State v. Belton, 441 So.2d 1195 (La.1983); State v. Anderson, 96-0810 (La.App. 4 Cir. 5/21/97), 696 So.2d 105. An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be engaged in criminal activity, or there must be reasonable grounds to believe that the person is wanted for past criminal conduct. State v. Moreno, 619 So.2d 62 (La.1993). A reviewing court looks to the facts and circumstances of each case to determine whether an officer had sufficient facts to justify an infringement of the suspect’s rights. State v. Robertson, 97-2960 (La.10/20/98), 721 So.2d 1268; State v. Carey, 609 So.2d 897 (La.App. 4 Cir.1992).
In State v. Ellington, 96-0766 (La.App. 4 Cir. 9/4/96), 680 So.2d 174, this court affirmed a judgment granting a motion to suppress. A police officer testified that he saw the defendant standing in an area known for high drug activity, and, upon seeing the marked police car, the defendant put his hands in his pocket as if attempting to conceal something. Thinking that this activity was suspicious and that the defendant was trying to conceal something in his pocket, possibly drugs, the officer stopped the defendant and conducted a pat-down search. A folding knife was found in the defendant’s right rear pants pocket. The officer then shined |7a flashlight into the same pocket and found a glass vial containing cocaine residue. This court found that these facts were not sufficient to justify the stop of the defendant. This court noted that the officer did not testify that he saw the defendant engaging in what appeared to be a drug transaction, or that he saw a suspicious object, which the defendant attempted to conceal. Further, this court stated that even if the initial stop was justified, the subsequent pat-down frisk of the defendant was not because La.C.Cr.P. art. 215.1 only allowed a frisk of outer clothing for a dangerous weapon. Since the officer did not testify to any particular facts from which he could reasonably infer that the defendant was armed and dangerous, this court held that the pat-down frisk was not justified.
Similarly, in State v. Williams, 621 So.2d 199 (La.App. 4 Cir.1993), the defendant was seen standing in a courtyard of a housing project. When he saw the police officers, “he turned immediately and quickly walked away.” The officers also saw him “fooling with his belt area.” The trial court denied the defendant’s motion to suppress the pipe the officers seized after the defendant was stopped and frisked. This court reversed the trial court’s ruling. We found that the articulated facts did not justify the initial stop of the defendant, and that even if the stop *619 was legal, the officers provided no evidence to justify the subsequent pat-down frisk.
In State v. Dappemont, 98-0446 (La.App. 4 Cir. 3/17/99), 734 So.2d 736, the defendant was standing in the courtyard of the St. Bernard Housing Project. When he saw the police officers, he walked away and placed his hands into his waistband area. The officers stopped him and ordered him to remove his hands. When he did so, the officers noticed a white piece of paper protruding from his zipper area. The officer conducted a pat-down search, and discovered a bulge where the paper was sticking out. The officer removed the bulge and found a red, | ¡¡white, and blue bag containing marijuana. This court affirmed the trial court’s ruling suppressing the evidence, noting that there was no testimony that the officer saw the defendant engaged in drug activity or that he saw the defendant attempt to conceal a suspicious object.
In State v. Hughes, 99-2554 (La.App. 4 Cir. 5/31/2000), 765 So.2d 423, the officers observed three men standing in front of a grocery while they were on patrol in an unmarked car near the intersection of General Ogden and Olive Streets at 3:30 in the afternoon. As the officers approached the grocery, they saw the defendant place a white object into his left pocket and hastily rush into the store. The officers exited their vehicle, followed the defendant, detained him, and conducted a pat-down search. The officers found a plastic bag in the defendant’s right front pocket. This court noted that no testimony indicated that the area was known for drug trafficking, that there had been recent complaints about that location, that the officers knew the defendant, or that they had information that the defendant was linked to drug activity. This court held that the circumstances did not justify the stop and reversed the defendant’s conviction and sentence.
In contrast, in State v. Benjamin, 97-3065, p. 3 (La.12/1/98), 722 So.2d 988, 989, the Louisiana Supreme Court stated:
This Court has previously ruled that flight from police officers, alone, will not provide justification for a stop. State v. Belton, 441 So.2d 1195 (La.1983). This activity, however, is highly suspicious and, therefore, may be one of the factors leading to a finding of reasonable cause. Belton, 441 So.2d at 1198. Given the highly suspicious nature of flight from a police officer, the amount of additional information required in order to provide officers a reasonable suspicion that an individual is engaged in criminal behavior is greatly lessened.
Here, Officers Rome and Pollard observed that Defendant, upon seeing the marked police unit, began to run away holding his waistband as if he were supporting |9a weapon or contraband. These objective facts known to the officers were sufficient to raise a reasonable suspicion that Defendant either was engaging or was about to engage in criminal activity and, thus, justified a stop.
The Court of Appeal ruled that because “it is not a crime to run from the police while clutching one’s waistband,” the stop was illegal. The Court of Appeal erred. Police to do not have to observe what they know to be criminal behavior before investigating. The requirement is that the officer have a reasonable suspicion of criminal activity.
See also Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); State v. Johnson, 2001-2081 (La.4/26/02), 815 So.2d 809.
In the case at bar, the officers had reasonable suspicion for a stop. The officers had received citizen complaints about *620 drug trafficking in the area, a public housing development. Detective Ferrier witnessed an apparent drug transaction: the exchange of money for a small plastic object. He broadcast a description of the purchaser: a man wearing a white t-shirt, blue jeans, and a green hat, 6'1", thin, and with a brown complexion. Other officers saw an individual matching the description in the area a short distance from where the transaction had occurred. Upon seeing the officers, the defendant took flight and ran into a stairway and up the stairs of an apartment building in the project and crouched down in an apparent attempt to hide. Even though Detective Ferrier ultimately said the defendant was not the man he had seen engage in the transaction, the other officers stated that at the time they stopped Lewis, they assumed that he was the man Detective Ferrier had described. Thus, at the time the officers stopped Lewis, the facts and circumstances known to them and of which they had reasonably trustworthy information were sufficient to justify the belief by a man of ordinary caution that the suspect was the man who had committed the crime. The suspicion led to Improbable cause when the defendant made his incriminating statements that they “had him” and that he had just thrown down cocaine. A voluntary, spontaneous statement is admissible without Miranda warnings, even if the defendant is in custody when the statement is made. State v. Lee, 95-1398, p. 2 (La.App. 4 Cir. 8/23/95), 660 So.2d 911, 913.
The trial court, apparently believing the State’s witnesses’ testimony and rejecting the testimony of both Lewis and Ms. Dab-ney, found the belief that the defendant was the person they were seeking was reasonable. The court viewed a picture of Lewis wearing the hat, and noted that it was aqua, a color often described as “greenish.” The officers were in hot pursuit of the defendant at the time of the arrest and thus could have easily thought of the aqua hat as “greenish.” As such, they had probable cause to arrest when they cornered Lewis and heard his statement in the stairwell about throwing down the drugs. They then properly searched him incidental thereto. Once the statement was made in this case, the officers had probable cause for arrest.
The district court is vested with great discretion when ruling on a motion to suppress. State v. Scull, 93-2360 (La.App. 4 Cir. 6/30/94), 639 So.2d 1239. The trial court in this case found that there was probable cause for the arrest and search. Considering our jurisprudence as discussed above, we do not find that the trial court’s decision was manifestly erroneous.
The assignments are without merit.

h,CONCLUSION

The conviction and sentence are affirmed.

AFFIRMED.