

# IN THE
# TENTH COURT OF APPEALS

### No. 10-14-00279-CR

**KYDRICK RESHAWD BENTON,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 361st District Court
Brazos County, Texas
Trial Court No. 13-04453-CRF-361**

## MEMORANDUM  OPINION

Appellant Kydrick Benton pleaded guilty to aggravated robbery, and a jury

assessed his punishment at thirty-eight years' confinement.  This appeal ensued.

### Guilty Plea

In his first issue, Benton contends that the trial court denied him due process of

law under the Fourteenth Amendment by accepting his guilty plea without properly

admonishing him of his rights and without determining that he was competent and was

entering his guilty plea freely and voluntarily. Similarly, in his second issue, Benton contends that the trial court erred in accepting a guilty plea that was in violation of Code of Criminal Procedure article 26.13(b), which states, "No plea of guilty or plea of nolo contendere shall be accepted by the court unless it appears that the defendant is mentally competent and the plea is free and voluntary." TEX. CODE CRIM. PROC. ANN. art. 26.13(b) (West Supp. 2016). Benton addresses these two issues together in his brief, and, other than citing the statute itself, Benton offers no argument or authority regarding the specific protections provided by article 26.13(b) or how the protections provided by article 26.13(b) differ from federal due-process protections. We therefore consider Benton's second issue inadequately briefed and will address only his first issue regarding federal due-process jurisprudence. *See Manns v. State*, 122 S.W.3d 171, 192 n.97 (Tex. Crim. App. 2003); *Johnson v. State*, 853 S.W.2d 527, 533 (Tex. Crim. App. 1992).

In this case, the following exchange occurred just before the voir dire examination began:

> THE COURT: All right. We're outside the presence of the jury, Cause No. 13-04453-CRF-361. Mr. Benton is present with his attorney.
>
> Mr. Benton, it's my understanding you want to plead guilty to Count 3 of the indictment; is that correct, sir?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: You understand you have a right to a trial by jury on the guilt phase as well as the punishment phase of the trial?
>
> THE DEFENDANT: Yes, sir.

THE COURT: You also have the right to confront and cross-examine witnesses, you have the right to call witnesses on your own behalf, you have a right to testify or not testify as you wish. You cannot been [*sic*] compelled to testify. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: You understand the range of punishment for this case is between five to 99 years or life imprisonment. I understand you have filed a request for probation, but you understand that is up to the jury and the jury alone?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. The State alleges in Count 3 that back on June the 13th of 2013, here in Brazos County, Texas, while in the course of committing theft of property, and with the intent to obtain or maintain control of that property, that you intentionally or knowingly threatened or placed Vidimara Garcia in fear of imminent bodily injury or death, and that when you did that you used or exhibited a deadly weapon, specifically a firearm.

Do you understand that charge of aggravated robbery?

THE DEFENDANT: Yes, sir.

THE COURT: And how do you plead to that charge?

THE DEFENDANT: Guilty.

THE COURT: It is my understanding that we are now going to go select the jury on the punishment phase of the trial and that the Defendant has filed his request for election for the jury to assess punishment and also filed his application for probation; am I correct?

[DEFENSE COUNSEL]: Those are on your bench, Tiffany wasn't here, he signed, it's been notarized, but it's bench-filed.

THE COURT: It's bench-filed, yeah.

[DEFENSE COUNSEL]: Judge, a scheduling question about all this just so we kind of have an idea about witnesses and what have you so we can work most efficiently for you.

My understanding from the State - - well, can you walk through what y'all anticipate?

. . . .

[PROSECUTOR]: We could take - - we could take the Defense witnesses out of order.

[DEFENSE COUNSEL]: That would work, Judge, because some of my witnesses - - I'm going to put a probation officer on. That will take 30 minutes.

THE COURT: Right. We can get one of those across the street.

[DEFENSE COUNSEL]: And I have one sheriff's guard that I'll put on over there so that we can put that - - as long as we're doing that, I'm confident that we can have him on a 15-minute standby so that if we get there - -

THE COURT: Okay.

[DEFENSE COUNSEL]: And I don't mind taking that out of order.

Kydrick, do you understand what we're talking about?

THE DEFENDANT: Yes, sir.

[DEFENSE COUNSEL]: Do you have any questions about that?

THE DEFENDANT: No, sir.

[DEFENSE COUNSEL]: Do you trust me when I say that that's okay?

THE DEFENDANT: That's okay.

THE COURT:  Yeah.  And that's fine with the Court too, because the jury is going to hear the evidence no matter what.

[DEFENSE COUNSEL]:  Yes, sir.

[PROSECUTOR]:  Right.

THE COURT:  It just may not be in the same order that we normally hear it.

[DEFENSE COUNSEL]:  And as long [as] we're explaining it and everything is going along.

THE COURT:  Yeah, that'll work.

[DEFENSE COUNSEL]:  We talked about one other issue on this, Judge.  The Court  - -  I had requested it and the Court had a competency and sanity evaluation done in this case.  In voir dire, part of what  - -  we've talked about how to address that with the jury.

My anticipation in voir dire is to bring up the issue that we wouldn't be here if there wasn't a finding of competency and sanity.  Because what I want to avoid  - -  I think what everyone wants to avoid  - -  is that through this case there will be some questions about Mr. Benton's mental status, but I don't want a psychiatrist in the box that's going to diagnose and do all sorts of strange things in there that  - -

THE COURT:  Because there's a question of when you put that psychiatrist on how much of his Fifth Amendment goes out the door, sometimes.

[DEFENSE COUNSEL]:  Yes, sir.  Yes, sir.

THE COURT:  Okay.  Very well.

Benton subsequently pleaded guilty in front of the jury.

Federal due process requires that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with

sufficient awareness of the relevant circumstances and likely consequences." A criminal defendant who enters a plea of guilty has by definition relinquished his Sixth Amendment rights to a trial by jury and to confront the witnesses against him, as well as his Fifth Amendment privilege against self-incrimination. "For this waiver to be valid under the Due Process Clause, it must be 'an intentional relinquishment or abandonment of a known right or privilege.'" A criminal defendant who is induced to plead guilty in a state court in total ignorance of the precise nature of the charge and the range of punishment it carries has suffered a violation of procedural due process. Such a defendant

> has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt. Without adequate notice of the nature of the charge against him, or proof that he in fact understood the charge, the plea cannot be voluntary in this … sense.

For his guilty plea to be constitutionally valid, then, the defendant must have an actual awareness of the nature and gravity of the charges against him and of the constitutional rights and privileges that he necessarily relinquishes—in short, "a full understanding of what the plea connotes and of its consequence."

*Davison v. State*, 405 S.W.3d 682, 686-87 (Tex. Crim. App. 2013) (footnotes omitted).

Benton argues that the record does not demonstrate that his guilty plea was entered freely, voluntarily, and knowingly. Benton asserts that he did not execute any written waiver of his rights and that the trial court failed to advise him of the right to be convicted only upon proof beyond a reasonable doubt, to inquire whether he was entering his plea knowingly and voluntarily, and to inquire if anything had been promised to him in exchange for his guilty plea. The State responds that due process does not require these specific admonishments.

Although due process does not require specific admonishments, *see Aguirre-Mata v. State*, 125 S.W.3d 473, 475-76 (Tex. Crim. App. 2003), it does require that the defendant have "a full understanding of what the plea connotes and of its consequence." *See Davison*, 405 S.W.3d at 686-87 (quoting *Boykin v. Alabama*, 395 U.S. 238, 244, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969)). Here, the trial court informed Benton that he had a right to trial by jury at both the guilt/innocence and punishment phases of trial, that he had the right to confront and cross-examine witnesses, that he had the right to call witnesses, and that he had the right not to be compelled to testify. Benton responded that he understood that he had these rights. The trial court, however, never explained to Benton what effect his pleading guilty would have on these rights. The trial court never informed Benton that he was relinquishing any of these rights by pleading guilty.

In *Boykin*, the U.S. Supreme Court held that when the record of a criminal conviction obtained by guilty plea contains no evidence that a defendant knew of the rights he was putatively waiving, the conviction must be reversed. *United States v. Benitez*, 542 U.S. 74, 84 n.10, 124 S.Ct. 2333, 2341 n.10, 159 L.Ed.2d 157 (2004) (citing *Boykin*, 395 U.S. at 243, 89 S.Ct. at 1712). But *Boykin*'s holding does not mean that a defendant necessarily prevails on his constitutional claim just because the record fails to show that he was properly admonished by the trial court. *Davison*, 405 S.W.3d at 687. "[T]he record must also be silent with respect to whether he was *otherwise* provided, or nevertheless

aware of, the requisite information to render his guilty plea voluntary and intelligent."

*Id.*

The record in this case is not totally "silent" with respect to Benton's knowledge that, by pleading guilty, he was relinquishing his Sixth Amendment rights to a trial by jury and to confront the witnesses against him, as well as his Fifth Amendment privilege against self-incrimination, at the guilt/innocence phase of trial. As shown above, the trial court did inform Benton of each of these rights. Furthermore, the record reveals that Benton indicated to his counsel during the punishment phase that he was frustrated with the State's presentation of the evidence against him, not because he wanted to challenge the witnesses or dispute the evidence, but because he had pleaded guilty because of what he had done and therefore wanted to simply accept his punishment without the State "bashing it in my head." It may therefore be inferred that Benton did not plead guilty without knowing that he was relinquishing his Sixth Amendment rights to a trial by jury and to confront the witnesses against him, as well as his Fifth Amendment privilege against self-incrimination, at the guilt/innocence phase of trial. We thus conclude that the trial court did not violate Benton's federal due-process rights by accepting his guilty plea as free and voluntary.

Benton also argues that the record does not demonstrate that he was competent to enter his guilty plea. Benton contends that although there is a reference made to a

competency evaluation, there was no inquiry made of him or his counsel about his competency at the time of trial.[1]

Under the Due Process Clause of the Fourteenth Amendment, a trial court may not accept a defendant's guilty plea unless that defendant is competent to make such a plea. *See Medina v. California*, 505 U.S. 437, 439, 112 S.Ct. 2572, 2574, 120 L.Ed.2d 353 (1992). But unless an issue is made of the defendant's mental competency at the time of the plea, the trial court need not make inquiry or hear evidence on the issue. *Kuyava v. State*, 538 S.W.2d 627, 628 (Tex. Crim. App. 1976); *see* TEX. CODE CRIM. PROC. ANN. art. 46B.004(c-1) (West Supp. 2016) ("A suggestion of incompetency is the threshold requirement for an informal inquiry."); *Medina*, 505 U.S. at 450-51, 112 S.Ct. at 2580 (holding that allocation of burden of proof to defendant does not offend due process). This is particularly true when the trial court had an opportunity to observe the defendant in open court. *Kuyava*, 538 S.W.2d at 628.

About five months before Benton entered his guilty plea, his counsel filed a motion suggesting incompetency and requesting an examination of Benton. During the above-quoted exchange that occurred just before the voir-dire examination began, his counsel acknowledged that a competency evaluation had been done and that Benton had been

---

[1] Benton asserts that the only other reference to his mental state was during the punishment phase when "the trial court was informed that [he] was threatening suicide," and the trial court "made no inquiry into his state of mind but simply advised him and his counsel that he was free to absent himself from the proceedings." Benton, however, does not argue that the trial court failed to inquire about his competency at that point in the punishment proceeding.

found competent. During the voir-dire examination immediately following the above-quoted exchange, Benton's counsel then stated:

> Okay. Tell you one thing here, is that in order to get to where we are today, where we are having a trial, the one thing that you can be guaranteed is that the individual on trial is competent and sane. Okay. That there are not questions about their competence or ability to understand the proceedings and what's going on. And their sanity, their ability to comprehend what they did, when they did it and to realize that it was wrong. Okay.

And there was no suggestion that Benton was incompetent when he subsequently pleaded guilty in front of the jury. Therefore, the trial court did not violate Benton's due-process rights by not inquiring about his competency at the time he entered his guilty plea. We overrule Benton's first and second issues.

## Motion to Suppress

In his third issue, Benton contends that the trial court erred in denying his motion to suppress the evidence that was seized during the warrantless search of his vehicle. Benton states that the question before us is "whether the facts were sufficient to perform a Terry frisk of a silver Lincoln when the only information law enforcement possessed was that the witness said the suspect had left in a [gray] Mitsubishi Galant[ ] and provided no license tag number."

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857,

861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor; and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108-09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Johnson*, 68 S.W.3d at 652-53.

Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the police can stop and briefly detain a person for investigative purposes if they have a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citing *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884-85). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular

person is, has been, or soon will be engaged in criminal activity. *Ford v. State*, 158 S.W.3d 488, 492-93 (Tex. Crim. App. 2005). This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Id.* at 492. Whether the totality of the circumstances is sufficient to support an officer's reasonable suspicion is a legal question that we review de novo. *See Madden v. State*, 242 S.W.3d 504, 517 (Tex. Crim. App. 2007).

At the hearing on the motion to suppress, Bryan Police Sergeant Lance Mathews testified that, on June 19, 2013, a 911 call was made, reporting that a robbery had just occurred at Prosperity Bank. The 911 call was admitted into evidence. The 911 caller, who identified herself by name, reported that Prosperity Bank had been robbed by a black male who had a handgun and was wearing a black hoodie, blue mask, and sunglasses. The caller further stated that the man had just left in a light gray Mitsubishi Galant with no license plate on the front and a paper license plate on the back.

Mathews testified that dispatch relayed that the suspect vehicle was a gray Mitsubishi Galant. Mathews has experience with civilian identifications of vehicles. He stated that sometimes civilians get the makes and models of vehicles "mixed up"; therefore, if dispatch said that the suspect vehicle was a gray Mitsubishi, he would try to narrow the search but would not limit it to only gray Mitsubishis.

Bryan Police Officer Crystal O'Rear testified that, on June 19, when the call was received about the bank robbery, she was dispatched to Prosperity Bank in a marked

patrol car. Dispatch gave her the vehicle description of a silver Mitsubishi Galant and informed her that a gun had been used in the robbery. She knew nothing about whether there were license plates on the vehicle.

O'Rear stated that, as she was traveling to Prosperity Bank, she saw a silver Lincoln LS with temporary tags on the back. She turned around to follow the vehicle because it looked similar to the vehicle described in the dispatch call. She was also a short distance—about a mile or two—from the bank, and she acknowledged that it would have been very reasonable for her to encounter the suspect vehicle at that point if it had left Prosperity Bank when she had gotten the dispatch call. She did not attempt to stop the vehicle at that time.

Benton argues that these facts were not sufficient to establish reasonable suspicion because the only information that law enforcement had at that time was that a witness said that the suspect had left in a gray Mitsubishi Galant and, according to Mathews, witness information about vehicles can be unreliable. But Mathews did not testify that witness testimony should be ignored; he merely testified that civilians sometimes get the makes and models of vehicles "mixed up." Furthermore, the reliability of an anonymous tip can be heightened when, as here, an informant places himself in a position to be easily identified and held responsible for the information provided. *Hawes v. State*, 125 S.W.3d 535, 538 (Tex. App.—Houston [1st Dist.] 2002, no pet.). The U.S. Supreme Court has recognized that because the 911 system "has some features that allow for identifying and

tracing callers," tips from 911 callers should be considered more reliable. *Navarette v. California*, 134 S.Ct. 1683, 1689-90, 188 L.Ed.2d 680 (2014). Courts also consider a person who is not connected with the police or who is not a paid informant to be inherently trustworthy when advising the police of suspected criminal activity. *Taflinger v. State*, 414 S.W.3d 881, 885 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Most importantly, however, the information from the 911 caller is not the totality of the circumstances. *See Ford*, 158 S.W.3d at 492-93.

O'Rear testified that when she turned around to follow the Lincoln, she lost sight of it but then saw it parked in a driveway. Another officer was with her by this point. They got out of their vehicles and walked toward the suspect vehicle. She did not see the driver because the windows of the vehicle were tinted. The vehicle then quickly reversed out of the driveway and drove away from them. O'Rear radioed dispatch to let them know that they "probably had the vehicle." She then got into her patrol car to try to find the suspect vehicle again. She subsequently received a call that the vehicle had been found in the same area where she had initially tried to contact the vehicle.

Benton asserts that the foregoing conduct by the driver of the Lincoln does not rise to a reasonable suspicion because it is not reasonable to presume that the driver of the Lincoln saw O'Rear when she attempted to approach the car while it was parked in the driveway. Benton argues that the driver's behavior could not therefore be categorized as flight. But because the trial court denied Benton's motion to suppress without express

findings of fact, we must assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record. *See Lujan v. State*, 331 S.W.3d 768, 771-72 (Tex. Crim. App. 2011). Here, O'Rear stated that she got out of her *marked* patrol car, along with another officer, and walked toward the suspect vehicle when the suspect vehicle *quickly* reversed out of the driveway and drove away from them. It can be rationally inferred from these facts that the driver of the Lincoln saw O'Rear as she attempted to approach the vehicle and fled. *See Reyes v. State*, 899 S.W.2d 319, 324-25 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd) (stating that flight alone may not justify investigatory detention, but flight from show of authority is factor in support of a finding that there is reasonable suspicion that person is involved in criminal activity).

Mathews testified that the suspect vehicle was found and that he went to the location. Several officers were already at the location where a silver Lincoln was parked in the driveway of one of the houses. Mathews said that the silver Lincoln looked very similar to a silver or gray Mitsubishi Galant. They set up a perimeter on the vehicle. Mathews stated that this was occurring minutes after the initial call came in about the bank robbery. At that point, they had not recovered the gun. The windows of the vehicle had dark tint on them, so they did not know if someone was still in the vehicle or how many suspects were involved. Sometimes in robbery cases, there is a person who never goes into the bank and whose job is to be the driver of the car.

Mathews testified that they called out to anyone who might be in the vehicle. They used a K-9 to try to draw someone out of the vehicle. Keys were then brought to Mathews by another officer. When asked by Benton's counsel where Mathews believed the officer got the keys, Mathews replied, "Off of your client at the tire shop just adjacent or just west of this house." Mathews "popped the trunk" with the key fob to make sure that the keys worked for the vehicle. He then unlocked the vehicle doors to give them the ability to more quickly and easily secure a person who might be in the vehicle. Officers then used the "K-9 Tahoe" as cover to approach the vehicle and open the driver's side door. Once the door was opened, they discovered that no one was inside the vehicle. But laying in the front seat, visible from outside the open door, was clothing that matched the description of the clothing worn by the suspect during the bank robbery, including gloves, a hooded sweatshirt, sunglasses, and a ball cap. They then entered the vehicle without a warrant.

We have already discussed the 911 caller's information and the driver's conduct when O'Rear walked toward the vehicle. Mathews's testimony then shows that the Lincoln was found parked again. This was occurring just minutes after the initial call came in about the bank robbery, so law enforcement did not know how many suspects were involved. The windows of the vehicle had such dark tint that the officers did not know if someone was still in the vehicle. And although the keys to the vehicle were

recovered, the evidence shows that neither the gun nor the clothing worn by the suspect during the bank robbery had been recovered.

We therefore conclude that, based on the totality of the circumstances, the officers had reasonable suspicion, supported by articulable facts and rational inferences from those facts, that there was a person in the Lincoln who was, had been, or soon would be engaged in criminal activity. *See Ford*, 158 S.W.3d at 492-93. It is not relevant that once the door to the Lincoln was opened, law enforcement discovered that no one was inside the vehicle. A mistake about the facts, if reasonable, will not vitiate an officer's actions in hindsight so long as his actions were lawful under the facts as he reasonably, albeit mistakenly, perceived them to be. *Robinson v. State*, 377 S.W.3d 712, 720-21 (Tex. Crim. App. 2012).

The trial court did not err in denying Benton's motion to suppress. We overrule his third issue.

Having overruled all of Benton's issues, we affirm the trial court's judgment.

REX D. DAVIS
Justice

Before Chief Justice Gray,
    Justice Davis, and
    Justice Scoggins
Affirmed
Opinion delivered and filed November 9, 2016
Do not publish
[CRPM]

